provement placed on her property by John Smith with her consent.

For these reasons and those assigned in our opinion, the application for a rehearing is refused.

**21 So.2d 731**

**JACKSON et al. v. NEW ORLEANS BOARD OF TRADE, Limited.**

**No. 37564.**

Feb. 21, 1945.

Rehearing Denied March 26, 1945.

Rosen, Kammer, Wolff, Hopkins & Burke, of New Orleans, for defendant and appellant.

Charles J. Rivet, of New Orleans, for plaintiffs and appellees.

HIGGINS, Justice.

This is an action on a quantum meruit basis by two attorneys at law to recover a fee in the sum of $9,300, for legal and notarial services rendered to the defendant between October 16, 1942, and December 1, 1942. The respondent admits the employment of the attorneys and that certain legal and notarial services were rendered in its behalf for which it offered to pay the plaintiffs the sum of $1,000, plus the $50 retainer fee, but denies liability for any additional sum, averring that the fee claimed by the plaintiffs is exorbitant. It specially pleaded that the parties agreed that the fee for services to be rendered was to be fixed by the Board of Directors of the defendant corporation for an amount which would be satisfactory to it.

The case was tried on the merits, resulting in a judgment in favor of the plaintiffs for the sum of $6,000.

The defendant appealed. The plaintiffs did not answer the appeal but stated that they desired the court to fix a reasonable fee for their services, in accordance with the evidence.

Under the special plea, the defendant's attorneys contend that the question of the amount of the fee having been left to the discretion of the client by the attorneys in the contract of employment and a reasonable fee of $1,050 having been fixed, in the absence of an allegation of fraud or error, the plaintiffs are bound thereby, citing Butler v. Winona Mill Co., 28 Minn. 205, 9 N.W. 697, 41 Am.Rep. 277; Lee's Appeal, 53 Conn. 363, 2 A. 758 and Davis v. General Foods Corporation, D. C., 21 F.Supp. 445.

Counsel for the plaintiffs counters by stating that the above authorities are from common law States and are not binding in Louisiana, a civil law jurisdiction, because under Articles 2034 and 2035 of the Revised Civil Code, agreements containing conditions made to depend solely upon the obligor's will or discretion are reprobated, citing Avery v. International Trade Exhibition, Inc., 163 La. 454, 112 So. 44, and Wallace v. International Trade Exhibition, Inc., 170 La. 55, 127 So. 362. He also makes the point that the evidence does not show that any such agreement was confected between the parties.

In response to the plaintiffs' bill for $9,300, and their letter of January 23, 1943, requesting payment thereof, the President of the defendant corporation, on January 29, 1943, replied, in part, as follows:

"You are about as familiar with the financial situation of The New Orleans Board of Trade, Ltd., as I am, and you know that The Board of Trade came out of its financial re-organization practically bare in pocket, hence I have not been able to discuss with you any lump sum settlement of a fee.

"I have had in mind discussing this whole thing with you, but every minute of my time has been taken up by my business connection and I have been unable to do so.

"*In reporting to the Board upon your retention as counsel, I advised exactly in line with my conversation with you that you would act for The Board of Trade, and the question of fee would be agreed upon between us at a later date.*" (Italics ours.)

"I have had the feeling that perhaps you would prefer an agreement along the line of a monthly or annual retaining fee, rather than a lump sum payment for your services in this particular case."

The secretary of the Board, in answer to the questions of the trial judge, stated:

"Q. Did you have any agreement at all personally with Mr. Jackson (one of the plaintiffs) as to any specific amount for a fee? A. No, sir.

"Q. None at all? A. *But I did attend several meetings with Mr. McKay* (President of the defendant corporation) *and a committee from the Board of Trade that endeavored to come to some agreement with Mr. Jackson as to what a reasonable fee would have been.* Mr. McKay had also asked me to call on Mr. Jackson in regard to his fee that he claimed he was due, and on a Saturday afternoon, I did contact Mr. Jackson and discussed the matter with him in detail, and finally, getting nowhere, I finally asked Mr. Jackson, I said: '*Mr. Jackson, what would you consider a reasonable fee?*' Well, he mentioned from four to five thousand dollars. I made a note of that conference and attached it to my records, and on the following day, a Sunday, Mr. Jackson wrote a letter to the Board of Trade, * * *." (Parentheses and emphasis ours.)

In the light of the foregoing evidence, it cannot be said that the attorneys agreed to leave the amount of their fee to the will or discretion of the Board of Directors of the client.

The defendant is a corporation organized and existing under the laws of the State of Louisiana and domiciled in the City of New Orleans. Its capital stock, at the time of organization on January 9, 1889, was fixed at $100,000. Its principal activity is fostering commerce and promoting the development of the Port of New Orleans. It acts as an agency between the exporters and importers of grain, i. e., beans, rice, coffee, etc., and the Board of Commissioners of the Port of New Orleans to inspect and grade grain and to issue certificates as to its condition. It also renders a service in the commercial affairs of the Port and the City in a similar way with respect to other commodities. It is a nonprofit sharing corporation and has never declared a divi-

dend. It had acquired nine pieces of improved real property in the City of New Orleans, appraised in 1942 for the sum of $186,000, eight of which were rented and one was occupied by its officers and employees. All of this property was heavily mortgaged for many years. In June 1940, a conventional mortgage for $96,000, bearing 6½% interest, was placed on all of the assets, movable and immovable, of the corporation, as well as its choses in action and franchise in favor of the Hibernia Mortgage Company, Inc. In the summer of 1942 the indebtedness had been reduced to $93,500, when the mortgage holder was making demands upon the defendant for payment of the past due mortgage note. The debtor unsuccessfully endeavored to interest two or three insurance companies, a bank, and the Reconstruction Finance Corporation in advancing a sufficient amount of money to refinance the mortgage. In September 1942, Mr. John McKay (now deceased) President and Manager, and Mr. James H. Ricau, Secretary-Treasurer of the defendant, personal friends of John E. Jackson (admittedly an able and experienced Attorney at law and a prominent citizen of this City), discussed informally with Mr. Jackson the difficulties they were having in refinancing the mortgage, which the creditor was threatening to foreclose. These two officers had succeeded in having the mortgage creditor grant several extensions of time to pay the note, the last one being to November 1, 1942. When Messrs. McKay and Ricau were informed that the Reconstruction Finance Corporation had declined to make the loan, they went to Mr. Jackson's office on October 16 or 17, 1942, and employed him as the attorney to represent the Board of Trade, and paid him a retainer fee of $50 on account of the legal services to be rendered. The following day, Mr. Jackson phoned Harry Latter of Latter & Blum, Inc., real estate brokers, and conferred with him with reference to securing a loan to take up the mortgage note, showing him a copy of the application and statements attached thereto that had been filed with the Reconstruction Finance Corporation. These documents had been prepared by the President, the Secretary-Treasurer and the Auditor of the defendant. Mr. Latter was so favorably impressed by the thoroughness of the application and statements attached thereto that he became interested in the matter. Mr. Jackson then telephoned the President and the Secretary-Treasurer of the Board of Trade, informing them that the firm of Latter & Blum, Inc., which represented investors, was a good prospect through which the loan could be made. The defendant's officials, upon Mr. Jackson's suggestion, then contacted Mr. Latter, who went to the defendant's office, looked over its books and records and secured additional information and statements of its affairs. After several conferences between these parties, some of which were attended by Mr. Jackson, Mr. Latter, on October 23, 1942, wrote a letter to the defendant, incorporating therein the plan for its refinancing. The proposition was accepted and Mr. McKay placed the communication in Mr. Jackson's hands with instructions that he draw a contract in legal

form embodying therein the agreement contained in the letter, as well as prepare a proper resolution of the Board of Directors of the defendant corporation, authorizing the President to sign the formal contract. Mr. Jackson complied with this request and the resolution was passed and the contract signed on October 26, 1942, under the terms of which a loan of $102,500 was to be made and secured by nine first mortgages aggregating $81,500, at 5%, and one second mortgage of $21,000, of which $12,000 would bear interest at 5%, and $9,000, representing the broker's fee of Latter & Blum, Inc. for its services in furnishing the refinancing plan and money, to bear no interest. The mortgages were to cover all of the real estate owned by the Board of Trade, but not its personal property or franchise. Pending the consummation of the new loan, four of the nine pieces of immovable property were sold to third parties through Latter & Blum, Inc., on commission, at a considerable loss, the prices aggregating $36,500, or $34,657 net. The loan contract was then amended so as to reduce the first mortgages to $59,000 and the second mortgage to $8,825, with $2,825 of the latter amount bearing interest. By effecting the transfers of these properties prior to their inclusion in the new mortgages, the defendant saved the costs of mortgage releases and a premium of 2½% which it would have had to pay to anticipate payment, in order to procure a release of mortgage. All of the interested parties concurred and co-operated in the efforts to obtain the extension to December 1, 1942, granted by the mortgage creditor but this was accomplished primarily through Mr. Latter's assurance and financial responsibility that the past due note would be paid on or before that date.

In its application to the Reconstruction Finance Corporation, the defendant declared that in the preceding ten years, it had made a net profit of $77,780.57. Mr. Ricau, in his testimony, stated: "After setting aside a cash reserve for amortization of loan, interest payments, taking into consideration all revenues" (including the dues received from its members) "and operating expenses * * *" the corporation would end the year 1944 with a cash surplus of "* * * around $9,-500." The defendant's President and its Secretary-Treasurer both testified that the corporation made contributions and donations to other civic undertakings and enterprises, especially to the traffic bureau.

Between October 26, 1942, and December 1, 1942, Mr. Jackson gave constant but not exclusive attention to a great many legal details in the matter substantially as follows: Conferences with the client, the prospective mortgage creditor, the mortgage creditor, and the four purchasers' attorneys, writing letters to and for the client to the mortgage creditor and the four purchasers' notaries; preparing resolutions for the sales of the four properties and resolutions authorizing the five first mortgages and the second mortgage passed by the Board of Directors of the defendant; procuring surveys of the properties at the lowest cost, after conferences with three surveyors; supervising nine applications for title insurance; clearing two

titles, one under the law of ten years prescription by two affidavits showing that the defendant purchased the property without having the title examined and had been in undisputed public possession thereof for more than ten years and services in connection with curing the title of another property consisting of an affidavit as to the marital status and offspring of a deceased party, who had owned the property previously; promoting rapid execution of the acts of sale, which had to be done simultaneously with the passing of the new mortgages; being present at the passing of the four acts of sale; executing two releases of the original mortgage; preparing and executing all six mortgages and furnishing certified copies thereof to client and the mortgage creditor; and supervising the change of insurance coverage, the proration of taxes, and the adjustment of rent on the alienated properties.

As a result of the combined efforts and co-operation of Latter & Blum, Inc., the Hibernia Mortgage Co., Inc., the mortgage creditor, Messrs. Jackson and Allen, and the President, the Secretary-Treasurer, the Auditor and Board of Directors of the defendant, the foreclosure of the client's property was avoided, the movable property and franchise of the defendant were freed of the mortgage, and the interest rate was reduced from 6½% to 5% a year on $67,825.

Mr. Allen, one of the plaintiffs, a reputable and competent attorney at law, testified that Mr. Jackson entrusted the notarial and curative title work to him and

impressed upon him the necessity of performing these services before the expiration of the extension period and that, thereafter, and until December 1, 1942, he devoted a great deal but not all of his time thereto. He stated that for the notarial and curative work he considered a fee of $1,600 fair and reasonable, in view of the urgency of the matter, the amount, and the responsibility involved. He also gave an estimated itemization value of the respective work he performed.

Mr. Jackson, after stating that his letter of December 4, 1942, substantially included the above detailed statement of services rendered, testified that he concluded he was entitled to a fee of $9,350, because he had saved the client that amount in attorneys' fees alone by preventing the foreclosure. Briefly, the attorney who would have foreclosed would have received a fee of 10% of the total amount of the mortgage of $93,500 under an express provision in the act. He refused to estimate the value of his respective services, stating that he had rendered a bill covering a fee in globo for all services both legal and notarial. He declined to estimate what part of the $9,350 charged covered his services for interesting and obtaining Mr. Latter to supply the refinancing plan and the money to pay the past due mortgage note.

Mr. Felix W. Gaudin, a reputable and capable practitioner of the Bar, with twenty-seven years experience, testified as an expert for plaintiffs and stated that after reading the hypothetical question containing an enumeration of all of the legal

and notarial services rendered by the plaintiffs and hearing their testimony, he considered a fee of $7,500 fair. In arriving at this conclusion, he admitted that he took into consideration the fact that he considered the plaintiffs were employed on a contingent basis and, in the event the proposed plan or contract of refinancing would fail, they would not receive any fee because all of the property of the defendant would be lost in the foreclosure proceeding; that there was moral responsibility on the attorneys to pay the title insurance fee and the surveyors' fees amounting to $728.75 and $350, respectively, if the client failed to do so; that time was the essence of the whole transaction; and that the attorneys were entitled to a fee for securing a new lender. On cross-examination, he was asked to state what he considered a reasonable fee for the legal and notarial services rendered by the plaintiffs from the time they drafted the contract of October 26, 1942, until the completion of the transaction before December 1, 1942, disassociating therefrom what he thought was the value of the services of the plaintiffs in procuring Latter & Blum, Inc., to have its client or clients advance the money. He stated that the fee for the legal and notarial work should be $2,500.

Mr. John D. Miller, a reputable and able member of the Bar, who had been practicing law for forty-one years, testifying as an expert, stated that after considering the hypothetical question incorporating all of the legal and notarial services rendered by the plaintiffs, as well as listening to substantially all of their testimony, he was of the opinion that a fee of $5,000 would be fair and reasonable. Upon his attention being called to the fact that there was not a guaranteed fee but the element of risk or contingency that if the proposed refinancing fell through and the mortgage creditor foreclosed, the fee of the plaintiff would not be paid, as the corporation would not have any means of doing so, he increased the amount to $6,000. When asked if the defendant had produced its own financier or broker and then requested the plaintiffs to furnish all of the legal and notarial services they rendered, what would be his idea of adequate compensation or remuneration therefor, he stated, the sum of $2,000.

The defendant's representatives practically conceded that all of the legal and notarial services claimed to have been rendered by the plaintiffs were performed and they did not produce any countervailing testimony as to what would be a fair and reasonable fee under the facts and circumstances of this case. They rely upon the provision in the contract that the notarial services to be rendered in connection with it were not to exceed $1,500. They emphatically deny that it was ever contemplated by the parties that the plaintiffs were to charge in the nature of a "finder's fee" for having referred them to and advised them to discuss the matter with Mr. Latter. In fact, the defendant's counsel contend that this is a suit for legal and notarial fees only as expressly stated in the plaintiffs' petition, which they alone, in proper person, signed

and, therefore, does not cover compensation or a fee for producing a financier or a broker who was willing to advance the money. They argue that the $9,000 fee paid to Latter & Blum, Inc. was the broker's fee or "finder's fee". They point out that Mr. Jackson, in his testimony, denied that he was making any charge in the nature of a "finder's fee", but later admitted that he was, and refused to state what part of his total fee was to be attributed to the legal and notarial services as distinguished from his effort to interest Mr. Latter in furnishing or having furnished the money.

Mr. Latter testified that he favorably and well knew Mr. Jackson, who originally introduced him to the matter and that he was influenced to a certain extent in considering the proposition because of Mr. Jackson's standing in the community, but stated that he was convinced and decided to undertake the transaction because of the splendid statement of the corporation's affairs prepared by the President, Secretary-Treasurer and the Auditor and the security he or his client was to receive.

██ We do not consider a so-called "finder's fee", that is, a fee for the simple act of referring an individual or corporation to a particular financial institution where the party or client borrows money, a legal or notarial service. For example, if a lawyer were to refer or recommend a party or client to a certain bank, a homestead, a finance or a brokerage company, or a lender to borrow money, and performed neither legal nor notarial services in connection with the accomplishment of the loan, those services being rendered by another lawyer and notary, clearly the mere telephone or personal message referring or recommending the party to the lender would be neither a legal nor a notarial service for which a professional fee could be charged. Plaintiffs have no agreement with defendant to that effect. There is no allegation in the plaintiffs' petition that they are seeking to recover any remuneration, compensation or fee other than for professional or legal and notarial services. Neither the plaintiffs' counsel, their two expert witnesses, nor they themselves refer us to any authority that a broker's or "finder's fee" for suggesting or recommending a lender to a borrower is considered a legal or a notarial service for which a professional fee may be charged.

Messrs. Jackson and Allen are entitled to charge a fee for legal services, for advice and consultation, for the time and effort they employed and utilized in studying, discussing and analyzing the defendant's problems and using their knowledge, ability, experience and standing in presenting the matter and in helping to persuade and convince the prospective lender that it was a sound legal investment.

We do not think that the evidence shows that Mr. Jackson was wholly responsible for interesting Mr. Latter in the proposition and convincing him and his associates that the transaction was an advantageous one to his firm and his client. Mr. Latter

states that defendant's records showed it was a good business deal with the proper security and he was convinced thereby.

■ The experts predicate their estimation of the fee to a great extent on the theory that the employment was on a contingent basis. From October 16 to October 23, 1942, before Latter & Blum, Inc., submitted a definite proposal, and to October 26, 1942, when the formal contract was signed, there was some element of chance that the refinancing would not be accomplished. Up to October 23, Mr. Jackson had interviewed Mr. Latter and his own client. If the matter had ended there, he would have lost only the amount of time and advice that he had given. It was after he started to prepare the contract of October 26 that he began to employ substantial time and efforts in the matter. When the contract was signed, the mortgage creditor, which had a claim of $93,500, was so confident of payment because of the financial standing of Latter & Blum, Inc., it withheld foreclosing on the mortgage. After that time, the plaintiffs also had definite assurance that they would be paid a reasonable fee for their services. So, the element of contingency must be largely eliminated from the case.

We disagree with learned counsel for the defendant that time was not an element in the case or that haste was not required, because there was considerable work to be done to meet all of the legal requirements. Plaintiffs had to attend to the legal and notarial work to complete the transaction by December 1, 1942. While the plaintiffs

did not give all of their time to this service, they devoted a great part of it to the general supervision and direction of the entire affair.

■ We do not agree with Mr. Jackson that he is entitled to $9,350 because, if the mortgage had been foreclosed by another attorney, he would have been paid 10% of the amount, or $9,350 for that service. Jackson had no contract with the defendant to that effect. The mortgage was not foreclosed. This salutary result was brought to fruition by the combined efforts and co-operation of the several parties who were involved in the matter. Exclusive credit cannot be given to Mr. Jackson and his partner for having obtained this advantage for the defendant. No transcendent or unusual legal question or complication was involved or presented. The problem was essentially a financial one, which was solved in the main by Latter and Blum, Inc., in working out the refinancing plan and furnishing the money to carry it out. This firm was paid $9,000 for its services. The plaintiffs did not examine any of the titles, institute any suit or perform any court work. They were reimbursed $138 for the costs of mortgage and conveyance certificates, tax researches, etc.

In *Dinkelspiel & Hart v. Pons*, 119 La. 236, 43 So. 1018, it was held:

"Determining the fees for services of an attorney is a matter of great delicacy, and a court in fixing them must be guided by a conscientious estimate of their value. State ex rel. St. Amand v. Bank [of Commerce], 49 La.Ann. 1060, 22 So. 207. Ex-

pert opinion, in such cases, is a guide, but is not necessarily controlling on the court. Randolph, Singleton & Browne v. Carroll, 27 La.Ann. 467; 4 Cyc. 1003. Where the nature and extent of the services are shown by the record, it is the duty of the court to bring to bear its knowledge of the value of the services of counsel. Gathe v. Broussard, 49 La.Ann. 312, 21 So. 839." See, also, Peltier v. Thibodaux, et al., 175 La. 1026, 144 So. 903.

The plaintiffs rely upon the cases of In re Tulane Homestead Ass'n, 202 La. 221, 11 So.2d 536, and In re Aetna Homestead Ass'n, 199 La. 929, 7 So.2d 188. Those two authorities are not in point, because there the expert testimony was predicated upon the legal services rendered. In the instant case, we have demonstrated that the experts erroneously took into consideration, in arriving at their estimate of a fair fee, the fact that the attorneys recommended their client to a lender and that their fee was on a contingent basis.

Considering the sum of money involved in the transaction; the extent of the responsibility imposed upon the attorneys and the notary; the amount, type and nature of the work performed; the period of time in which it was accomplished; the urgency of the matter; the quasi civic nature of the defendant corporation and its financial condition; the ability, skill and efficiency of counsel and the notary; and the results achieved (In re Interstate Trust & Banking Co., 204 La. 323, 15 So.2d 369), it is our opinion that the sum of $4,000 is a reasonable and fair compensation and remuneration for the legal and notarial services performed by the plaintiffs in behalf of their client.

For the reasons assigned, the judgment of the district court is amended by reducing the award from $6,000 to $4,000 and, as thus amended, the judgment is affirmed; the appellees to pay the costs of this Court and the appellant to pay the costs of the district court.

O'NIELL, C. J., and ROGERS, J., are of the opinion that an allowance of any sum above $2,500 is excessive.