JAMES M. DAVIDSON *vs.* RICHARD S. ROBIE.

Suffolk.    December 3, 1962. — January 16, 1963.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Contract,* With "finder." *Limitations, Statute of. Interest. Damages,* For breach of contract. *Practice, Civil,* Judgment ordered by Supreme Judicial Court.

Evidence in an action warranted a finding that the defendant asked the plaintiff to "keep his eyes open for deals" in corporate stock and to bring them to the defendant's attention, and agreed to pay the plaintiff for such services, without further services on the part of the plaintiff by negotiation or otherwise, a certain percentage of any profits ultimately realized by the defendant from sale of interests acquired in such "deals." [338–340]

In an action for a "finder's fee" consisting of a certain percentage of profit realized by the defendant upon sale of an interest in a corporation acquired in a "deal" brought to his attention by the plaintiff, on evidence that the defendant, having acquired an interest in the corporation in the "deal," received stock in a new corporation formed to acquire all the stock of the original corporation and transferred his interest in the old corporation to the new corporation, and subsequently sold his stock in the new corporation at a profit, a finding was warranted that the plaintiff's claim was not barred by the statute of limitations where the action was commenced within six years after the sale of the defendant's stock in the new corporation, although more than six years after the transfer of his interest in the old corporation to the new corporation. [340–341]

Interest on a "finder's fee" claimed by the plaintiff in an action should run only from the commencement of the action where the plaintiff failed to prove definitely the time of an alleged prior demand for the fee. [341–342]

Where a warranted verdict for the plaintiff in an action of contract for a "finder's fee" was in an amount which, even after a remittitur, was excessive on undisputed evidence as to damages and the proper rule as to interest, there was no occasion for a retrial and this court overruled the exceptions and ordered the entry of judgment on the verdict in the correct amount after recomputation in the trial court. [342]

CONTRACT. Writ in the Superior Court dated December 19, 1958.

The action was tried before *Hudson, J.*

*James D. St. Clair* for the defendant.

*John M. Bashaw* for the plaintiff.

CUTTER, J. The declaration in substance alleges an express contract in that Davidson, at Robie's request, rendered service in connection with selling stock of Boston Storage Warehouse Company (Storage), that Robie agreed to pay Davidson "ten per cent . . . of any profit realized by . . . [Robie] from the transaction, and . . . with regard to any sales of stock received by . . . [Robie] in connection with . . . [the] transaction," and that Robie received such a profit but did not account to Davidson. Robie filed a general denial and pleaded the six year statute of limitations. See G. L. c. 260, § 2 (as amended through St. 1948, c. 274, § 1). There was a verdict for Davidson of $9,050 taken under leave reserved. Robie saved exceptions to the denial of his motions for a directed verdict and for entry of a verdict under leave reserved. A motion for a new trial was denied upon condition that Davidson remit $750 of the verdict, which he did. To the denial of this motion, also, an exception was saved. The evidence is stated in its aspect most favorable to Davidson.

About 1951 Robie caused Davidson to be employed for six months by a company controlled by Robie. Davidson's salary was $10,000. Robie asked Davidson "to keep his eyes open for deals on the outside. Robie was interested in them and told Davidson he would take care of him."

Robie "became interested in the stock of . . . Storage . . . as a result of . . . [Davidson's] mentioning it to him six or seven months after" Davidson had been employed by

Robie's company. Robie then owned no stock in Storage. Subsequently Davidson called Robie's attention to other deals, including one relating to Taunton Pearl Works. Robie "had an agreement with . . . [Davidson] to pay him a commission with respect to the Taunton Pearl Works . . . but [claimed that] he had no such agreement" as to Storage. The Taunton Pearl Works deal was put in writing (see fn. 1, *infra*) at Robie's suggestion. There was "no written agreement . . . [about] the stock of . . . Storage . . . and Robie did not suggest" one.

In 1951, Davidson told Robie that one Babson owned 20% of the stock of Storage and that two other groups could not obtain control because of Babson's interest. Robie, in Davidson's presence, called one Nordblom (who was in one of these groups) and thereafter told Davidson that "Nordblom had agreed to sell his 40% control to Robie. Robie told Davidson that he would make the same deal with him as he had on Taunton Pearl Works." Davidson's recollection was that Robie then proposed as compensation "ten percent of the profit when . . . Robie finally made a profit."[1] Compare the testimony described in fn. 3, *infra*.

Davidson was aware that "Robie intended to buy all" the stock of Storage. "Davidson was able to have Babson agree to sell" his stock but "had nothing to do with the acquisition of the Nordblom stock." Davidson knew also that Robie was undertaking to purchase all the stock of Storage, that he had made a deposit of $80,000, and that he intended to borrow the balance of the total purchase price of "about a million dollars." Davidson did not assist Robie in getting financing.

"The deal that Davidson was trying to put through . . . was . . . [one] in which Robie could own 100% of the stock

---

[1] There was in evidence a letter to Robie, relating to the Taunton Pearl Works deal, signed by Davidson (and signed also, "Agreed Richard S. Robie") dated January 23, 1952, describing the proposed transaction. It concluded, "in the event of your sale of the . . . Pearl Works . . . whether the sale is through the sale of your stock or otherwise, I am to receive ten per cent of the profit. In estimating the profit we agree that it shall be the difference between the sale price and the purchase price plus all expenses."

of'' the then existing Storage corporation (the old company). The deal actually made was one in which Robie became owner of 20% of the stock of a new company. Robie found that he ''could not borrow . . . the money necessary to complete the purchase. Rather than lose his deposit he employed . . . [one] Harber to help him find a purchaser for all the shares.'' Harber ''introduced Robie to Messrs. Berdon and Levine,'' who formed a new corporation (the new company) in May, 1952, to acquire the stock of the old company. The new company ''made a tender to all shareholders of the old company to purchase their stock'' and eventually acquired all the stock of the old company which was then dissolved. Robie transferred to the new company all his rights to purchase stock in the old company and received back $55,000 of his $80,000 deposit and a 20% stock interest in the new company.

Except for the $25,000 (not returned from the $80,000 deposit) ''Berdon and Levine . . . put up all of the money (for the old company stock) . . . approximately $975,000.'' Davidson ''did not bring Berdon and Levine to Robie'' and ''never talked to . . . Harber.'' He did talk ''with Berdon and Levine before they put money in and explained the warehouse to them and its future possibilities.''

Robie caused Davidson to be employed by the new company at an annual salary of $15,000. In 1957, Robie sold his 20% interest in the new company to Berdon and Levine for $103,750.[2]

Davidson left the employ of the new company in 1953. He received no compensation from Babson with respect to the sale of Babson's stock. When Berdon and Levine came into the deal and ''the original deal . . . was changed over,'' Davidson did not make any claim to Robie for 10%

---

[2] An exhibit showed the profit on the transaction in 250 shares of the new company stock to have been computed as follows: —
Date of sale — January 21, 1957.

|  |  |  |
|---|---|---|
| Selling price | $103,750 |  |
| less commission to Harber | 7,500 | $96,250 |
| Date of purchase — June 4, 1952, cost |  | 25,000 |
| Profit |  | $71,250 |

of the profits or for a commission. He first made such a claim in 1957 or 1958 "after he found out that Robie had sold his 20% interest in the new company.[3]

1. Robie contends that there was no evidence of any valid contract or of the terms of such a contract. See *Geo. W. Wilcox, Inc.* v. *Shell E. Petroleum Prod. Inc.* 283 Mass. 383, 388; *Hurwitz* v. *Parkway Country Club, Inc.* 343 Mass. 661, 665; *Jacoby* v. *Koufman,* 344 Mass. 761, 762; *Kelley* v. *Hansen,* 254 F. 2d 99, 104 (1st Cir.).[4] Cf. *Noble* v. *Mead-Morrison Mfg. Co.* 237 Mass. 5, 18–19; *Simons* v. *American Dry Ginger Ale Co. Inc.* 335 Mass. 521, 523–526. Davidson testified to an arrangement that was not the usual agreement for a broker's commission. Cf. *Bloomberg* v. *Greylock Bdcst. Co.* 342 Mass. 542, 546–547. Cf. also *Smith* v. *Plant,* 216 Mass. 91, 98. There was no written contract except as the terms of the Taunton Pearl Works deal (see fn. 1, *supra*) were referred to in the oral arrangements described by Davidson. It is not clear whether, or to what extent, Davidson was required to perform any specified services in carrying out any deal. He does not appear to have been a broker (see Restatement 2d: Agency, § 2, comment b; § 445 et seq.) in the sense of being employed to negotiate for Robie, or to introduce the parties to each other, or to be the effective cause of arranging a particular transaction. His own testimony suggests that he did only three things, viz. (a) he recognized that the old company presented a business opportunity, knew who its shareholders were, and discovered that Babson was willing to sell his shares; (b) he reported the circumstances to Robie; and (c) he "talked with Berdon and Levine before they put

[3] No claim for a commission on the Taunton Pearl Works deal was ever made because on that a loss was suffered. Although Davidson claimed (1) that Robie with respect to the Storage deal had promised him "the same kind of deal as the Taunton Pearl [Works]" and (2) that in the Taunton Pearl Works situation he was "to get 10% of the operating profits . . . if any, and 10% of the profits realized from the sale of Robie's share[s] . . . when . . . sold," Davidson in his testimony did not claim 10% of the operating profits of old Storage.

[4] Other cases include *Burke* v. *Campbell,* 258 Mass. 153, 155–156, *Adhesive Prod. Co.* v. *Ridderstrom,* 270 Mass. 485, 489–490, and *Caggiano* v. *Marchegiano,* 327 Mass. 574, 580. Cf. *Weiner* v. *Pictorial Paper Package Corp.* 303 Mass. 123, 131–133.

Davidson *v.* Robie.

money in and explained the . . . possibilities."[5]  The in-
definite arrangement discussed in the testimony called at
most for preliminary investigation by Davidson of possible
business ventures, and a disclosure of them to Robie which,
if profitable, would give rise to compensation in the nature
of a commission, or, perhaps what is sometimes called a
"finder's fee," to be paid "to one who brings to . . . [the
promisor] a deal out of which he makes money."  See *Cray,
McFawn & Co.* v. *Hegarty, Conroy & Co. Inc.* 27 F. Supp.
93, 97, fn. 1 (S. D. N. Y.)[6] affd. per cur. 109 F. 2d 443
(2d Cir.).

The evidence about the content of the alleged contract
comes only to this.  Davidson was asked "to keep his eyes
open for" interesting deals.  Robie "told Davidson he
would take care of him" and later "that he would make the
same deal with him as he had on the Taunton Pearl Works,"
which was "ten percent of the profit when . . . Robie finally
made a profit."  This was slightly inconsistent (see fn. 3,
*supra*) with another part of Davidson's testimony in which
he asserted that Robie had also promised him 10% "of the
operating profits of the company."  There was written evi-

___

[5] He does not seem to have intended to associate himself with Robie as a
joint adventurer or to incur any exposure to loss himself.  Cf. *Cardullo* v.
*Landau,* 329 Mass. 5, 8; Williston, Contracts (3d ed.) §§ 318–319C; annotation,
138 A. L. R. 968.  Cf. also *Fitch* v. *Ingalls,* 271 Mass. 121, 125.

[6] In the *Cray, McFawn & Co.* case, Judge Woolsey quoted, with approval,
Berle, Cases and Materials on Corporation Finance, p. 602, "The finder's com-
mission is a fruitful subject of dispute.  It is often not agreed on in advance,
though good practice would suggest this . . . ."  See *Palmer* v. *Wahler,* 133
Cal. App. 2d 705, 709–710; *Jackson* v. *New Orleans Bd. of Trade,* 207 La. 571,
583–584; *Towers* v. *Doroshaw,* 5 Misc. 2d (N. Y.) 241, 248–252, and cases
cited.  In the *Towers* case the court (at p. 249) points out that, with respect to
an alleged agreement, not reduced to writing "to pay compensation to a
'finder' for the disclosure of a name alone, without an introduction or nego-
tiations leading to an eventual transaction," it is incumbent on a plaintiff to
establish the contract "by evidence of a quality and quantity sufficient to
satisfy the court of a clear and unequivocal intention by the defendant to pay
for the mere disclosure."  The resemblances and differences between a
"finder" and a broker are illustrated in *Shaffer* v. *Beinhorn,* 190 Cal. 569,
573–574, *McKenna* v. *Edwards,* 19 Cal. App. 2d 327, 331, *Crofoot* v. *Spivak,*
113 Cal. App. 2d 146, 148, *Freeman* v. *Jergins,* 125 Cal. App. 2d 536, 547
et seq., and *Kuffler* v. *List,* 144 F. Supp. 776, 778–779 (S. D. N. Y.).  See
also *Lindeman* v. *Textron, Inc.* 229 F. 2d 273, 274–275 (2d Cir.), *S. C.* 143
F. Supp. 955 (S. D. N. Y.); *Bittner* v. *American-Marietta Co.* 162 F. Supp.
486, 488–489 (E. D. Ill.); *Wells* v. *Dent,* 4 App. Div. 2d (N. Y.) 307, 308–309;
*Corson* v. *Keane,* 4 N. J. 221, 225–227.

dence about the Taunton Pearl Works arrangement (see fn. 1, *supra*).

Even upon this imprecise and scanty evidence (and the evidence of Robie's subsequent conduct), we think the jury were warranted in concluding, at least by reference to the Taunton Pearl Works letter, (1) that Robie asked Davidson to put "deals" before him for consideration and gave Davidson the reasonable expectation that he would be paid for doing so (see Williston, Contracts [3d ed.] § 36); (2) that, when the Storage deal was mentioned to Robie, he agreed to pay Davidson "ten percent of the profit" from sale of the interest which Robie might acquire in Storage (see fn. 1), to be measured by the "difference between the sale price and the purchase price plus all expenses"; (3) that Robie indicated by his conduct that he expected to carry on negotiations himself (see *Bloomberg* v. *Greylock Bdcst. Co.* 342 Mass. 542, 546–547; see also *Kuffler* v. *List,* 144 F. Supp. 776, 778–779 [S. D. N. Y.]) and required no further services from Davidson by way of negotiation or otherwise; and (4) that the compensation was to be payable with respect to any profitable sale transaction reasonably and proximately growing out of the Storage proposal brought to Robie by Davidson. See *Corleto* v. *Prudential Ins. Co.* 320 Mass. 612, 616–617; *Morad* v. *Haddad,* 329 Mass. 730, 734–735; *Seckendorff* v. *Halsey, Stuart & Co.* 259 N. Y. 353, 356–357. See also *Bloomberg* v. *Greylock Bdcst. Co.* 342 Mass. 542, 547–548, 550.

Various circumstances had bearing upon whether it was reasonable upon the evidence (and permissible inferences from the evidence) for a jury to make such findings. At the outset some matters may have been tentative (see *Chiapparelli* v. *Baker, Kellogg & Co.* 252 N. Y. 192, 197) or vague (see *Von Reitzenstein* v. *Tomlinson,* 249 N. Y. 60, 64) or left for later determination. See *St. Regis Paper Co.* v. *Hubbs & Hastings Paper Co.* 235 N. Y. 30, 36. These early uncertainties reasonably raise doubt whether they were later cured by substituting a specific arrangement for Robie's promise to "take care" of Davidson. The arrangements,

in any event, were oral and nebulous with respect to a substantial matter as to which careful business people would be likely to make some written agreement, as was done in the Taunton Pearl Works matter. The seemingly unsubstantial services to be performed by Davidson were only sketchily defined. This unusual type of oral arrangement as the cases already cited (see fn. 6, *supra*) indicate, is unquestionably susceptible of misstatement and exaggeration and can lead to unwarranted claims. All these and other circumstances, however, go only to the weight and reliability of the testimony, matters for the jury, and to the reasonableness of the various permissible inferences to be drawn from it.

2. Robie contends that his acquisition of Babson's 20% holding of shares in the old company was the only effect produced by Davidson's efforts to which the alleged contract for compensation related. This stock was sold to the new company and Berdon and Levine not later than June, 1952 (see fn. 2, *supra*), more than six years before this action was commenced on December 19, 1958, and thus, Robie says, any claim for compensation was barred by the statute of limitations.

We perceive no merit in this contention. We have held that the jury were warranted in concluding that the arrangement between Robie and Davidson provided for compensating Davidson for producing the Storage "deal" with 10% of those profits eventually realized which were proximately related to that deal. The jury could reasonably have found that it was contemplated that Davidson might receive compensation (a) for a deal in Storage stock differing considerably from the first deal attempted by Robie and (b) in case a profit grew out of any reasonably direct developments of either deal. It could have been found, also, that Davidson knew of the changed arrangements and, indeed, actually talked with Berdon and Levine while they were being negotiated. It was probably more consistent with the intention of the parties to determine in 1957 whether a profit had been made (at what might reasonably be re-

garded as the completion of the whole Storage transaction)
when Robie clearly "finally made a profit," than in 1952
when he received 20% of the shares of the new company,
of uncertain value.  There is nothing in the circumstances
that would permit us to rule as matter of law that the profit
was realized in 1952.  The jury could reasonably have con-
cluded that the amount of compensation was not determined
until the 1957 sale.

3.  Robie argues that the trial judge erred in permitting
the verdict to stand because its amount is inconsistent with
all the evidence about the profit made by Robie, even taking
into account the $750 remittitur.  There is no serious dis-
pute about the evidence relating to the amount of profit
(see fn. 2, *supra*).  On the basis most favorable to the plain-
tiff, the cost of Robie's interest in the new company was
$25,000.  Davidson knew that Harber had been paid $7,500,
which we regard as clearly a proper deduction from the
gross profit on the sale.  Without the financing by Berdon
and Levine, obtained by Harber, the deal might have been
unprofitable.  There was no testimony indicating that Robie
received any other price than $103,750 for his 20% of the
stock in the new company.  Robie's profit at most could be
found to be $71,250.

Upon Davidson's theory of the case his compensation
could not have become due before January 21, 1957, when
he became entitled to have Robie compute his profit on the
Storage deal within a reasonable time and pay the 10%
compensation.  The claim should not be regarded in any
event as entitling Davidson to interest prior to a proved
demand.  See *Vaughan* v. *Lemoine,* 330 Mass. 83, 86–88;
Restatement: Contracts, § 337 (b).[7]  Although Davidson
testified that "[t]he first time he made . . . a claim [for
payment] was . . . in late 1957 or early 1958," no definite
date of demand was proved until the commencement of the
action on December 19, 1958, from which date to the date of

---

[7] See also *Cochrane* v. *Forbes,* 267 Mass. 417, 420; *Crowley* v. *Boston,* 342
Mass. 344, 350; *Bright* v. *American Felt Co.* 343 Mass. 334, 336; Corbin, Con-
tracts, §§ 1046, 1048.  Cf. *H. D. Foss & Co. Inc.* v. *Whidden,* 254 Mass. 146,
151–152.

the verdict (April 20, 1961) interest upon $7,125 should have been awarded. The verdict computed in accordance with the principles already stated would have been somewhat less than the verdict, as reduced by the remittitur, of $8,300.

There is no occasion for a retrial merely because the remittitur did not reduce the verdict sufficiently. The amount of the verdict is to be recomputed in the Superior Court in accordance with this opinion and judgment is to be entered (see G. L. [Ter. Ed.] c. 235, § 8) upon the verdict as so recomputed. See *Salter* v. *Leventhal*, 337 Mass. 679, 700. See also G. L. c. 231, §§ 124, 127 (as amended through St. 1945, c. 578, § 1).

4. The exceptions are overruled, subject, however, to recomputation in the Superior Court of the amount of the verdict in accordance with this opinion.

*So ordered.*