HAROLD SIMON, Respondent-Appellant, *v.* ELECTROSPACE CORPO-
RATION, Appellant-Respondent, et al., Defendants.

First Department, May 1, 1969.

*Hyman L. Rutman* of counsel (*Lesser, Rutman & Kurtz,*
attorneys), for respondent-appellant.

*Arnold C. Stream* of counsel (*Netter Lewy Dowd Fox Ness &
Stream,* attorneys), for appellant-respondent.

NUNEZ, J. This appeal brings up for review a judgment in favor of plaintiff for a commission claimed to have been earned pursuant to a written agreement with defendant Electrospace Corporation by finding and presenting to that corporation a business opportunity which ultimately resulted in a merger with another corporation, Robosonics, Inc.

In October of 1964, plaintiff, an officer of a public relations firm acting as management and financial consultants, was contacted by the then president of Electrospace, William Brown, for the purpose of enlisting plaintiff's aid in finding a business deal for Electrospace. After some preliminary discussion, plaintiff sent Brown a draft of a proposed agreement which provided that '' in the event you [plaintiff] can effect the sale of the stock of this corporation or similar related arrangement * * * by introduction to a party or parties with whom a transaction will be thereafter consummated, then 5% of the gross value of the transaction will be paid as a commission to you at the time of closing.'' This draft was reviewed by the counsel to Electrospace who suggested certain changes which were incorporated in the letter of employment dated October 14, 1964, signed and delivered by Brown of Electrospace to plaintiff without further discussion between the parties as to its terms or tenor. A copy of the agreement was forwarded to Electrospace's secretary and counsel and filed by him. This agreement added a provision that plaintiff's retainer was nonexclusive and further that: '' In the event of a sale of stock, or all of the assets, or a merger as arranged by you with a corporation, company, or individual introduced by you on terms approved by the stockholders of Electrospace Corporation, a fee of 5% of the gross value of the transaction will be paid as a commission at the time of closing, in cash or stock of the company purchasing.''

At the time of the agreement, the president of Electrospace gave plaintiff and his associate financial data concerning Electrospace to be presented to interested persons. Additionally, they were taken by the president on a tour of the plant and introduced to various officers, including the vice-president who later became president. During the ensuing months plaintiff and his associates approached several companies with regard to an acquisition of Electrospace and in fact arranged for the president of Electrospace to meet with representatives of three interested companies. However, plaintiff was informed that the meetings had been fruitless.

In May, 1965 one of plaintiff's associates was approached by Louis Taxin, president of Royal Business Funds Corporation, concerning the possibility of arranging a merger for Robosonics,

Inc., an electronics firm in which Royal Business Funds Corporation was a principal stockholder. This inquiry was communicated to plaintiff, who thereafter met twice with Taxin, gave him financial information relative to Electrospace and subsequently arranged the initial meeting between the president of Electrospace and Taxin. This resulted in meetings in June, 1965 between the president of Electrospace and officers of Robosonics for the purpose of exploring the possibilities of a sale of Electrospace to Robosonics. Plaintiff was not present at these meetings and was later advised that nothing had been concluded.

In September of 1965 the president of Electrospace left the company and was succeeded by the vice-president, Arnold Wolf. The trial testimony of the former and the new presidents was to the effect that Wolf had been vaguely informed by Brown of the efforts to have Electrospace acquired by another company, but that Wolf had not been advised of plaintiff's employment nor of the meetings with Robosonics. Indeed, the testimony of these two officers, as well as that of the counsel and secretary to Electrospace, was rather vague. They stated that they could not recall whether they had ever met plaintiff in person and Wolf stated that although he did have dealings with two of plaintiff's associates he had not been told by them that they were associated with plaintiff. The counsel testified to receiving a copy of the revised letter agreement incorporating his suggestions and to filing it, but he insisted that he did not know that it had been signed, having made no inquiry about it. He further testified that Brown had told him of his meeting with Taxin, but maintained that he was not told of the meetings with Robosonics.

In any event, it is clear that in July, 1966, one of plaintiff's associates spoke with Wolf of Electrospace regarding the reactivation of a deal with General Dynamics Corporation that had been proposed to the former president. A meeting was arranged and this resulted in a business trip to the Electrospace plant in Puerto Rico and to another of the company's plants in upstate New York. However, plaintiff's associate was advised by Wolf in November, 1966 that the prospects for a deal were not bright. Plaintiff's associate telephoned Wolf again in January, 1967 and was again told that the prospects for a deal with General Dynamics were poor. At this time, according to the testimony of plaintiff's associate, Wolf was asked whether negotiations were being carried on with any of the prospects introduced by plaintiff, including Robosonics, and Wolf replied that he was not at liberty to discuss the matter. Wolf acknowledged that such a conversation had taken place, but maintained that plain-

tiff's associate had made no inquiry as to negotiations with Robosonics or any other specific deal.

The testimony at the trial discloses that it was at this very time that negotiations with Robosonics were being renewed. In December of 1966 Taxin contacted Wolf and when they met in January, 1967, Taxin talked of a possible deal with Robosonics. Wolf testified that this was the first he had heard of Robosonics and that Taxin told him of the previous unsuccessful meetings with the former president of Electrospace concerning a deal with Robosonics. Furthermore, Taxin told him that there were no finder's fees involved. Wolf also stated that plaintiff's name was not mentioned at his initial meeting with Taxin nor at later meetings which culminated in the merger. It should be noted that the merger agreement did in fact provide for a " finder's fee " to Taxin and an underwriter, although the latter claimed that the fee actually represented special consultant services. The court did not have the benefit of Taxin's testimony on this or any other subject. Although defendant submitted Taxin's affidavit in support of its motion for summary judgment the efforts of both sides to procure his presence at trial were unavailing. Yet the minority opinion cryptically states " Taxin was equal to the situation ''. Indeed he was!

The merger transaction itself was consummated on June 12, 1967. Under the agreement, Electrospace was merged into Robosonics, thus allowing the new entity to take advantage of Robosonics' substantial tax loss carry-over, with a change of name of Robosonics to Electrospace. Underlying the merger transaction was an exchange of securities and a public offering of debentures in the sum of $2,500,000.

Defendant argues that because the ultimate transaction between Electrospace and Robosonics was " entirely different '' from that discussed at the first meetings initiated by plaintiff, plaintiff is not entitled to recover. That the details of the transaction differed from those initially discussed is immaterial. Here the agreement expressly envisaged a merger and that is just what took place — a statutory merger at that. Thus, the instant case is quite different from *Brown* v. *Snyder* (57 App. Div. 413) where the court found that the ultimate transaction was not one contemplated by the plaintiff's narrowly drawn compensation agreement.

Nor does the mere lapse of time preclude tracing a connection between plaintiff's introduction of the business and the reactivation and final consummation of the transaction. Whether the ultimate merger transaction was contemplated by the letter agreement was for the consideration of the trier of fact, here

an experienced Trial Judge, whose findings are not lightly to be upset.

Nor can it be said that plaintiff abandoned his employment. The record shows that plaintiff and his associates presented and recommended business opportunities to defendant Electrospace from the time of plaintiff's retainer to the time of the Robosonics' merger, and were in fact in touch with Wolf of Electrospace concerning another possible deal at the very time the Robosonics matter was being renewed. And even after plaintiff's introduction of Taxin had fructified into a deal, defendant suffered plaintiff's continued search of other prospects for Electrospace. Furthermore, the testimony at trial reveals that Electrospace never affirmatively terminated plaintiff's employment or expressed dissatisfaction with plaintiff's efforts on its behalf. Cases such as *Sibbald* v. *Bethlehem Iron Co.* (83 N. Y. 378) and *Sternberg* v. *Bellanca Aircraft Corp.* (259 App. Div. 538), where there was good faith termination of the agency by the principal or where the plaintiff's right to act was expressly terminated by a contingency provided for in the contract do not help defendant, for here we have neither situation. Rather, what we have here is the plaintiff engaged in a continuous and active seeking of opportunities for the defendant with its full knowledge and consent. Plaintiff was effectively excluded from further participation and Taxin arranged for himself a substantial finder's fee although both the president and counsel for Electrospace stated that he was not the finder. And, as stated by the learned Trial Judge, arguments as to whether plaintiff could have arranged the underwriting of debentures which was apparently necessary to effectuate the merger are not to the point.

If a transaction ultimately entered upon is a direct result of the disclosure of the opportunity by the finder the latter is entitled to his compensation. In this case plaintiff introduced the parties who later consummated the merger. From this point on the parties conducted their own negotiations and excluded plaintiff therefrom. The record amply supports the ruling by Trial Term that plaintiff is entitled to compensation under the terms of his written agreement and the facts as found. (See *Minichiello* v. *Royal Business Funds Corp.,* 18 N Y 2d 521, 527; *Ames* v. *Ideal Cement Co.,* 37 Misc 2d 883, 886; *Seckendorff* v. *Halsey, Stuart & Co.,* 234 App. Div. 61.)

In *Minichiello* (*supra,* p. 527) Judge KEATING said: " If, indeed, there is any definite distinction between finders and brokers, it would probably be in the quantity of services rendered by each. *It is possible for a finder to accomplish his service by making only two phone calls and, if the parties later*

*conclude a deal, he is entitled to his commission.*" (Italics ours.)

In our view the only substantial question is the proper measure of damages. The agreement provides for " a fee of 5% of the gross value of the transaction ", to be " paid as a commission at the time of closing, in cash or stock of the company purchasing." Plaintiff claims 5% of the value of all the shares issued on the reorganization of the two corporations in exchange for the previous shares, plus 5% of the face value of the debentures sold to the public. Defendant contends that if plaintiff is entitled to recover, his fee must be limited to 5% of the net worth of Robosonics, $21,850. The learned trial court rejected the measure of damages proffered by the parties and awarded plaintiff 5% of the net worth of Electrospace.

We believe the proper measure of damages must be such as would make the plaintiff whole, as would place him in the position money-wise he would have occupied had the agreement been honored. (*Menzel* v. *List*, 24 N Y 2d 91.) The plaintiff, by his agreement, is entitled to 5% of the stock issued to Electrospace at the time of the merger. Absent a delivery of such stock, plaintiff may have the value of it at the time of trial. The record fails to disclose sufficient evidence as would allow any reasonably accurate determination of this value.

Damages should be fixed on the basis of the value of the stock plaintiff was entitled to at the time of the trial. Accordingly, the judgment should be modified on the law and the facts to the extent of ordering a new trial limited solely to the issue of damages to be assessed in accordance with this opinion and as so modified affirmed without costs and disbursements.

STEUER, J. (dissenting). Electrospace Corporation, a New York corporation (hereinafter Electrospace [NY]), was in 1964 engaged in the electronics business, the bulk of its business being government contracts. Its stock was closely held by its officers and management and by people such as its landlords, who had some interest in it. At that time these people, led by Brown, its president, desired to cease active business and to realize on the good will and assets of the company. To this end it contacted plaintiff, with whom it entered into a written contract for a nonexclusive brokerage contract to procure a purchaser either for the assets or stock of the company by outright sale or merger of the company into another.

To find such a purchaser plaintiff sought the advice of Louis Taxin, president of a commercial lending company, who suggested one of his clients, Robosonics, Inc., also engaged in a phase of the electronics business. Plaintiff arranged a meeting

between the principal officers of both companies. It shortly developed at that meeting that Robosonics was in no financial position to buy Electrospace (NY), and the meeting broke up.

Plaintiff did nothing further after that. Electrospace (NY) continued to seek a buyer through other brokers but with no success. After some 18 months had elapsed, Taxin approached defendant with a new idea. He pointed out that if Electrospace (NY) acquired Robosonics it would be greatly to the former's advantage in that Electrospace (NY) would be facilitated in expanding its business in private, as opposed to governmental, operations; it would acquire a substantial operations loss (available for tax deductions), which loss resulted from Robosonics' operations and would offset Electrospace (NY)'s profits; and would have the benefit of Robosonics' stock exchange listing.[1] Discussions followed. It was discovered that the original purpose of a sale of Electrospace (NY) to Robosonics was still out of the realm of possibility. And it was further recognized that a purchase by Electrospace (NY) of Robosonics would defeat two of the major attractions of the deal—for with the absorption and demise of Robosonics both its tax advantage and its connections for marketing its stock would disappear. Taxin was equal to the situation. He proposed that the merger take the form of the absorption of Electrospace (NY) into Robosonics. And so it eventually did.

Plaintiff takes the position that the transaction was as the documents necessarily indicate—an acquisition by Robosonics of Electrospace (NY). Regardless of interested testimony and the wording of the formal instruments, the real nature of the transaction appears without possibility of contradiction from the following indisputable facts. The officers and directors of Electrospace (NY), with minor exceptions, became the officers and directors of Robosonics.[2] The same is true of the management. The Robosonics plant and office were moved to the premises occupied by Electrospace (NY). The name of Robosonics was changed to Electrospace Corporation. However, as Robosonics was a Delaware corporation, the new Electrospace Corporation was likewise a Delaware corporation, and will be referred to as Electrospace (Del.). The obvious purpose

---

1. Just what that listing was at the time is not clear. Robosonics' stock had been traded in on the over-the-counter market for some time and later it was listed on the American Stock Exchange.

2. There was one notable exception. Brown, the Electrospace president, adhered to his original idea to get out. He traded in his stock for the stock of a small subsidiary company. The new president of Electrospace (Del.) was the former vice-president of Electrospace (NY).

of this change of name was that the Electrospace business could be continued with customers and others without embarassment, interruption or interference. The stockholders of Robosonics traded in their shares on a one-for-three basis, while the Electrospace (NY) shareholders received four for one, giving them complete control. As far as assets are concerned, a comparison of the price of Robosonics and Electrospace (Del.) stock indicates that about 80% of the contribution to the reorganized company came from Electrospace (NY). It is not subject to dispute that in fact Electrospace acquired Robosonics and not the reverse.

There was a stumbling block to consummation of the deal. It required money which neither party had. Money was needed for these reasons: Taxin insisted that a loan by his corporation to Robosonics be liquidated; the physical transfer of the old Robosonics operation to the Electrospace plant in Long Island would entail considerable expense; a reserve had to be set up to buy out possible dissenting stockholders; and additional working capital was needed for the contemplated expanding operations. Taxin undertook to find this money and he did in the form of an underwriting of debenture bonds of Electrospace (Del.).

It is inconceivable that on these facts plaintiff is entitled to any recovery at all. Employed to bring about a certain transaction, neither that transaction nor any reasonably related to it was ever effectuated. Cases where the ultimate transaction is so radically different from the one plaintiff was hired to procure are not common, but are not unknown. In *Brown* v. *Snyder* (57 App. Div. 413) plaintiff was hired to sell defendant's gas company to United Gas Improvement Co., or to buy from that company a subsidiary which was competing with defendant's company. Plaintiff introduced the parties but negotiations did not succeed. Later the parties met and concluded an arrangement which involved neither of the alternatives. It was held there was no performance and no recovery.

Even if with utter disregard of the facts it be deemed that this was a merger within the terms of plaintiff's contract, still no recovery is warranted. A broker with a nonexclusive contract acquires no vested interest, even with regard to persons he introduces. His agreement is for a reasonable time only and the consummation of a sale after that time through the efforts of others gives him no rights (*Sibbald* v. *Bethlehem Iron Co.*, 83 N. Y. 378, 384). Where the person introduced by the broker refuses to do business with the seller but, after a considerable lapse of time, changes his mind and does, the

broker does not benefit by the original introduction (*Sternberg v. Bellanca Aircraft Corp.*, 259 App. Div. 538). It is true that in *Sternberg* the brokerage contract contained a provision that time was of the essence, but this court (DORE, J.) had this to say (p. 541): "Were there no expressed mention of the fact that time is of the essence, it could not be said that two years was a reasonable time." The lapse of time between the original introduction and an eventual contract is significant in that it obviates any question of bad faith on the part of the broker's employer. Where there have been no dealings between the seller (buyer) and the person produced by the broker for a period of years, it can hardly be said that the failure of the original transaction was sham and a subsequent fruitful arrangement indicates bad faith.

Plaintiff argues that these considerations do not apply because he was not hired as a broker but as a finder. While this argument is contrary to the tenor of the agreement and the finding of Trial Term, it is, even if true, of no moment. A finder must, in order to satisfy his agreement, find someone willing to perform according to this employer's terms. And he must perform within a reasonable time. Of course, if the negotiations are continuous until fruition, the finder has performed. But if they are broken off in good faith and not resumed within a reasonable time, the original introduction is meaningless. It should be noted that in *Brown* (*supra*) and *Sternberg* (*supra*) the plaintiffs' agreements would make them finders.

In the view taken, questions as to damages are not reached. But the conflict on this point illustrates the validity of the conclusion reached herein. Ordinarily, nothing is simpler than to calculate a broker's commission, based as it is on an agreed percentage of the price received by the seller. Here there are three contentions as to what that figure should be. The stipulated percentage is 5%. Plaintiff claims 5% of the value of all the shares issued on the reorganization of Robosonics in exchange for the shares previously held by the Robosonics and Electrospace (NY) shareholders, plus the same percentage of the face value of the debentures issued in connection with the reorganization. Trial Term rejected this contention and awarded judgment for 5% of the value of the stock issued to the Electrospace (NY) stockholders. This court rejects this determination and awards 5% of the stock issued to Electrospace. None of these can be logically supported because, as seen, there was no sale by Electrospace (NY) or its stockholders and they received nothing that they

did not already have. Trial Term, recognizing this, ruled that as there was some different transaction, a commission was payable, but, as indicated, it is impossible to determine what it should be. No one has yet hit upon a method of inserting a square peg into a round hole.

The judgment should be vacated and the complaint dismissed.

Capozzoli and McGivern, JJ., concur with Nunez, J.; Steuer, J., dissents in opinion in which Eager, J. P., concurs.

Judgment modified, on the law and the facts, to the extent of ordering a new trial limited solely to the issue of damages to be assessed in accordance with the opinion of this court filed herein and, as so modified, affirmed without costs and without disbursements.