Martin A. TRAIN and Vantage
International, Plaintiffs,

v.

ARDSHIEL ASSOCIATES, INC., et
al., Defendants.

No. 83 Civ. 2584 (LLS).

United States District Court,
S.D. New York.

May 15, 1986.

Jerome A. Halperin, P.C. (Jerome R. Halperin, Alice Slater, of counsel), Fryer, Ross & Gowen, (Gerald E. Ross, of counsel), New York City, for plaintiffs.

Pollack & Kaminsky (Daniel A. Pollack, Edward T. McDermott, of counsel), New York City, for defendants.

OPINION

STANTON, District Judge.

This case presents one of the recurring types of disputes which arise when a large acquisition or merger has been completed

and a brokerage commission or finder's fee is sought, based on an asserted oral agreement. Here the claim is by an alleged finder for a share of the fee already collected from the principal by a firm of financial consultants. It raises the familiar questions whether there was an agreement, whether such an agreement is barred by the statute of frauds, and whether the plaintiff performed his part.

After a three-day nonjury trial, I resolve those questions in this case in plaintiff's favor.

## BACKGROUND

In January 1980 plaintiff Martin Train's employment as an executive in Brussels came to an end and he found himself, apparently in comfortable financial circumstances and with many business contacts in Europe, interested in engaging in some enterprise of his own.

He got in touch with the defendant Henry B. Turner, and visited him on February 7, 1980 in Turner's new office in New York City. Turner had recently become affiliated with the defendant Ardshiel Associates, Inc. ("Ardshiel") whose principal, Richard M. Hexter, was respected by both Turner and Train for his business acumen and connections. Turner told Train that Ardshiel represented a new start for him, he was very hopeful of its prospects and he wished Train to meet Hexter.

Hexter and Train spent considerable time together on the morning of February 7, 1980, during which Hexter explained that Ardshiel's activities included consulting, evaluating companies and providing financial advice for investment banking purposes such as raising money, recapitalizing or selling a company. In particular, he showed Train a current Ardshiel project in which it had been retained by Comerco, Inc. ("Comerco") to analyze Comerco, to advise its management in appraising its value, and to obtain a purchaser for Comerco and assist with its ultimate sale. Ardshiel had performed the analysis and evaluation, for which it had already received a $25,000 fee, and it was then attempting to find it a buyer. When a buyer was found and the transaction closed with Ardshiel's assistance, Comerco would pay Ardshiel a much larger fee calculated as a portion of the purchase price.

Those facts do not appear to be contested. What happened thereafter is in dispute. From the credible testimony, my observation of the witnesses, and the weight of the credible evidence at trial I find the following.

During his meeting with Hexter, Train asked how the project of finding a buyer for Comerco was going. Hexter replied that it was not going well, and that Ardshiel had "scoured the world" with lists and letters without obtaining any solid interest. Train stated that he knew that many Europeans were investing in the United States, that those most apt to be interested in a company like Comerco were probably located in England and Germany, and that he could help. Hexter said that Ardshiel should do something pretty quickly since the engagement with Comerco was coming to an end and they had to produce some potential buyers. Train told Hexter that he knew a man whose specialty was the purchase of American companies by German companies, who was then in New York and might be interested. Hexter told Train that if he found a company which eventually purchased Comerco, Ardshiel would share its fee from Comerco fifty-fifty with Train.

Ardshiel had prepared a "selling document" for Comerco, which was confidential and only to be given to potential buyers with Comerco's permission. Ardshiel gave a copy of the document to Train the weekend following the February 7, 1980 meeting.

On the following Monday, February 11, 1980, Train met at Ardshiel's offices with defendant Louis Klein, Jr., who was in charge of the Comerco project for Ardshiel. They discussed the selling document and Klein's strategy for locating a buyer. Klein had already contacted several of the foreign companies Train believed might be

interested, but to no avail. After this meeting, Train was convinced that his acquaintance, Frank F. Beelitz, a New York investment banker working primarily with German companies, could provide valuable help. He obtained the necessary clearance to show Beelitz the Comerco selling document, met with Beelitz, stimulated his interest in the project and obtained Beelitz' agreement that any compensation of Beelitz' employer Morgan Guaranty Trust Company of New York would be paid by Comerco's purchaser rather than by Comerco or Ardshiel.

In a series of meetings and communications thereafter, Beelitz brought Comerco to the attention of a German company, BASF Ag (unsuccessfully) and of Henkel KG aA, a German chemical company. Henkel became interested in acquiring Comerco, but for various reasons thought the acquisition was not an appropriate one to make itself. Henkel referred the proposed acquisition to The Clorox Co., a U.S. corporation in which Henkel held a twenty percent stock interest. Clorox and Beelitz corresponded concerning the proposed acquisition, but in August 1980 Comerco stated that it was not interested in Clorox as a purchaser. At that point Beelitz' and Train's efforts came to an end.

In mid-September 1980 Clorox engaged its traditional investment banker, Morgan Stanley & Co., to contact Comerco. Negotiations ensued, at first unsuccessfully, on the basis of a stock-for-stock transaction and then, after interim changes in Clorox management, an agreement resulted in Clorox's acquisition of Comerco for a combination of cash and notes.

Under its agreement with Comerco, Ardshiel received a fee of $987,500. Asserting that he is entitled to half that amount under his own oral agreement with Hexter, Train claims $493,750, together with interest and costs.

Defendants assert that (1) there was never any agreement between Ardshiel and Train; (2) since the alleged agreement between Ardshiel and Train is oral, it is barred by the applicable Statute of Frauds, New York General Obligations Law, Section 5–701; and (3) Train did not perform his side of the agreement.

## DISCUSSION

### (1) The existence of an agreement

At first blush it may seem extravagant that Ardshiel, working in many respects as Comerco's investment banker, would offer to share half its fee of almost $1 million with Train, with whom Hexter had no previous business experience. Yet the circumstances argue for that conclusion.

When Train met with Hexter in February 1980, Ardshiel was nearing the end of its exclusive engagement and had not developed a seriously interested purchaser for Comerco. Ardshiel did not need Train's business experience or his views concerning Comerco's value, or his assistance in the conduct of negotiations. What it needed was help in finding a buyer.

The evidence reflects that Comerco was not altogether satisfied with Ardshiel's efforts and progress, and Ardshiel had reason for concern. In a memo Klein wrote on February 25, 1980, he stated that William Weyerhauser, principal shareholder and director of Comerco, was "concerned about when we get concrete offer" and "surprised that something not happened by now". Exh. A–97. He wrote that Weyerhauser "wants to see something as definitive as possible by Board Mtg 3/20". *Ibid.* Later, at Comerco's April 21, 1980 board of directors' meeting, Mr. Weyerhauser expressed his concern that "conditions had prevented [Comerco] from generating 'positive responses within a reasonable period of time', [and] that he did not want Comerco 'to continue to hang out there' with the possibility of becoming soiled merchandise as time went by"; and the board directed that although Ardshiel could continue discussions with those companies it had already contacted, it was not to make any new contacts. Exh. A–14.

Ardshiel denies that it was concerned or anxious in February 1980. It claims it had two live prospects on February 7, 1980.

Only eight days later one of those, General Mills Inc., told Ardshiel that it was not interested and the other, Richardson-Merrell, Inc., sent the same message on April 15. Tr. 320–21.

Regardless of those two prospects and their potential as buyers for Comerco, on February 7, 1980 Train represented an opportunity for Ardshiel. If one of Ardshiel's other prospects purchased Comerco, Ardshiel would owe Train nothing. If Train produced a buyer, one-half the fee was better than nothing. As a lifeboat the agreement was provident.

Three other facts support the finding of an agreement.

First, after Train heard that Comerco had been sold to Clorox, he wrote to Turner (Exh. A–24): "I understand that you have now made a final settlement with Comerco and I am surprised, that I have not heard from you in view of the agreement I made with you and Dick. Please let me hear from you." Turner responded (Exh. A–25): "... YOUR CONTACT TO BEELITZ WAS ONLY ONE OF FOUR. ARDSHIEL HAD CONTACTED HENKEL OVER 2 YEARS AGO. OUR FILES WILL DOCUMENT THIS. SUGGEST YOUR NEXT VISIT YOU REVIEW THE FILES WITH ME."

This response tacitly recognizes the existence of "the agreement [Train] made with you [Turner] and Dick [Hexter]" by failing to deny it, under circumstances where a denial would be natural if there had been no such agreement. At trial, Turner claimed that his telex was "an insipid response" to "an insipid letter" (Tr. 434), and he thought that to simply respond "we had no agreement" would have been a "reiteration of the obvious." *Ibid.* That explanation is unpersuasive.

Second, Train not only contacted Beelitz and kept in contact with him thereafter as to the results of Beelitz' efforts. He also contacted at least one European company, Imperial Chemical Industries ("ICI"), himself. Although ultimately unsuccessful, this resulted in meetings between high-level officials of ICI and Ardshiel to discuss the purchase of Comerco. I do not conclude from this that Train was acting gratuitously, but rather that he was making good his commitment to interest European companies in Comerco.

Third, Ardshiel gave Train a copy of the confidential selling document it had prepared for Comerco, which was only for selected prospective buyers whom Ardshiel had cleared with Comerco. As of February 7, 1980, Ardshiel had distributed only thirteen copies. The weekend following the meeting, it gave the fourteenth copy to Train. Tr. 330. Ardshiel's claim that it gave the document to Train to show the quality and type of work it does is not persuasive, in light of the confidential and exclusive nature of the document and Ardshiel's desire to develop more buying interest. Moreover, when Train met with Klein on February 11, 1980, they discussed not only the selling document but up-to-date financial information on Comerco.

■ Thus the probabilities, as well as my observation and evaluation of the witnesses, lead me to find that Hexter offered to share Ardshiel's fee fifty-fifty with Train if Train found a buyer for Comerco. I have considered the different words in which Train has described that agreement at different times, of which defendants make much, and they do not impair his credibility on that fundamental point.

(2) Statute of Frauds

Ardshiel asserts that enforcement of an oral agreement between it and Train is barred by the Statute of Frauds, N.Y.Gen. Oblig.L. § 5–701(a)(10).

The New York Court of Appeals has held that the Statute of Frauds is not applicable to agreements between two finders who pool their efforts and share the fee received by one finder from its principal. *Dura v. Walker, Hart & Co.*, 27 N.Y.2d 346, 318 N.Y.S.2d 289, 267 N.E.2d 83 (N.Y. 1971). The court in *Dura* rejected the argument that N.Y.Gen.Oblig.L. § 5–701(a)(10), which requires that contracts between a finder and his principal or employer be in writing, applies to co-finders. It

held that § 5–701(a)(10) is not aimed at the co-finder relationship (it "was aimed at the protection of principals or employers against claims for brokers' or finders' fees and, indirectly, at protecting brokers and finders in their dealings with principals not with one another", *id.*, at 291–92, 267 N.E.2d at 350) and there is "no need to protect one broker or finder against the unlikely and rare claim of another." *Id.*, at 291, 267 N.E.2d at 350. Holding that plaintiff's claim was outside the statute since he was suing a fellow finder, the court in *Dura* described the theory of recovery as "closely akin to that of a joint venture with its overtones of fiduciary obligation". *Id.*, at 292, 267 N.E.2d at 350. Defendants have seized upon that and given it a falsely critical significance.

Thus defendants argue that the words "closely akin to that of a joint venture" require plaintiff to show that his relationship with Ardshiel satisfied the legal elements of an actual joint venture. They seek support in *Haskins v. Loeb Rhoades & Co.*, 52 N.Y.2d 523, 438 N.Y.S.2d 989, 421 N.E.2d 109 (N.Y.1981), where the New York Court of Appeals held that the statute barred a finder's fee claim because the relationship was one of employment and plaintiff showed "no evidentiary facts which indicate the existence of any enterprise even remotely resembling a joint venture." *Id.*, at 990, 421 N.E.2d at 525.

Neither *Dura* nor *Haskins* requires that plaintiff establish that a joint venture was created, or that the relationship technically meet any particular element of a joint venture, in order to fall outside the statute of frauds. The court in *Dura* addressed a single-transaction, quasi-partnership relationship between the parties and differentiated it from that of a principal-broker relationship, or that between a finder and his employer, to which the statute of frauds applies. It used the "joint venture" language only to describe the theory (not the proof) on which recovery is allowed when brokers or finders "pool their efforts and share the benefits".

In *Haskins,* the court markedly restricted the exception by the dictum that it was available only to "a business enterprise" (rather than a legal theory) closely akin to a joint venture. Nonetheless, it simultaneously stated that (438 N.Y.S.2d at 990, 421 N.E.2d at 525):

> [I]t is true that when two brokers or finders decide to 'pool their efforts and share the benefits' the agreement to share in the profits of the joint enterprise need not necessarily be in writing [citing *Dura* ] ..."

That is the situation here. The parties pooled their efforts. When their efforts culminated in a deal, they were to share the benefits, the fee that Ardshiel would receive for producing a buyer and effecting a sale of Comerco. As stated in *Sven Salen A.B. v. Jacques Pierot, Jr., & Sons, Inc.*, 559 F.Supp. 503, 507 (S.D.N.Y.1983), *aff'd*, 738 F.2d 419 (2d Cir.1984), "the arrangement alleged is very much like a joint venture, even to the point of [plaintiff's] being required to absorb any losses caused by the cobrokers' [sic] failure to earn a commission." So here, the parties absorbed their own expenses. Ardshiel did not reimburse Train, as might be done in an employment situation. *Compare Monsky v. Lazard Freres & Co.*, 84 Civ. 6453 (MJL) (S.D.N.Y. January 17, 1986) (treating an agreement to absorb losses as a critical element).

Under the New York Court of Appeals' language in *Haskins*, quoted above, when the two finders agree orally to pool their efforts and share the benefits the resulting temporary enterprise need not meet every legal requirement of a joint venture for the agreement to be binding. If it did, only joint ventures would be excepted. Whatever the competing policy considerations, the New York Court of Appeals, whose decisions control this diversity case, excepted enterprises "closely akin" to a joint venture, which is itself "in the nature of a partnership engaged in the joint prosecution of a particular transaction for material profit." Black's Law Dictionary (5th ed. 1979). That definition fits the enterprise here so closely as to except it from

the statute of frauds under *Dura* and *Haskins*.

To the extent that a right must be shown in each venturer to participate in control of the enterprise, that requirement is met. Train's locating and stimulating a buyer was entirely in his own control, subject only to prior clearance of prospects with Comerco, a requirement which also applied to Ardshiel.

For the foregoing reasons, I conclude that the agreement is not barred by the statute of frauds.

**(3) Train's performance of his obligations**

Defendants argue that even assuming an enforceable agreement, Train did not "find" Clorox, so he is not entitled to his portion of Ardshiel's fee. They claim a finder "must not only identify the business opportunity for his client, but also must introduce and bring together his client and the other parties." Def. Post-Trial Brief, p. 22. Defendants assert that since neither Beelitz nor Train introduced or arranged a meeting between the principals of Comerco and Clorox, Train did not "find" Clorox under the terms of the agreement.

There does not appear to be one specific function that a finder must perform. "The services performed by finders may vary from case to case." *Ames v. Ideal Cement Co.*, 37 Misc.2d 883, 235 N.Y.S.2d 622, 625 (N.Y.S.Ct.1966). The New York Court of Appeals in *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 277 N.Y.S.2d 268, 272, 223 N.E.2d 793 (1966) stated that "[i]t is possible for a finder to accomplish his service by making only two phone calls and, if the parties later conclude a deal, he is entitled to his commission."

New York courts have distinguished between finders and brokers. Finders find potential buyers or sellers, stimulate interest and bring parties together. Brokers bring the parties to an agreement on particular terms. *See Ames v. Ideal Cement Co.*, 235 N.Y.S.2d at 625; *Simon v. Electrospace Corp.*, 32 A.D.2d 62, 299 N.Y.S.2d 712 (1969), *modified on other grounds*, 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971). The distinction is that finders do not have to negotiate the transaction to earn their fee. *Ames v. Ideal Cement Co.*, 235 N.Y.S.2d at 625.

This does not mean, however, that a finder must always introduce the principals of the two interested parties. In many cases the finder has done so, *see Klein v. Smigel*, 44 A.D.2d 248, 354 N.Y.S.2d 117, (1974); *Simon v. Electrospace Corp.*, 32 A.D.2d 62, 299 N.Y.S.2d 712; *Knauss v. Krueger Brewing Co.*, 142 N.Y. 70, 36 N.E. 867 (1894); *but see Lehman v. Arlen Operating Co.*, 54 Misc.2d 372, 282 N.Y.S.2d 837 (N.Y.S.Ct.1967) (finder merely introduces and brings parties together or brings transaction to attention of prospect); *Bushkin Assoc., Inc. v. U.S. Filter Corp.*, 79 A.D.2d 367, 436 N.Y.S.2d 651, *aff'd*, 55 N.Y.2d 763, 447 N.Y.S.2d 245, 431 N.E.2d 970 (1981); *Wells v. Dent*, 4 A.D.2d 307, 164 N.Y.S.2d 646 (N.Y.App.Div.1957). However, a finder's duties fundamentally depend on the nature of his agreement with his co-finder or principal. *See Kule Resources, Ltd. v. Reliance Group, Inc.*, 49 N.Y.2d 587, 427 N.Y.S.2d 612, 404 N.E.2d 734 (1980).

Ardshiel asked Train to help it find a buyer for Comerco. It needed an interested purchaser and Beelitz, acting on Train's behalf, provided one. He did more. He contacted Clorox, corresponded with its Manager of Planning and Development, John Cadle, and sent Cadle financial information concerning Comerco. Upon learning that Clorox was interested, Beelitz notified Ardshiel, who sent Clorox's 1979 Annual Report and Proxy Statement and 1980 fiscal results to Weyerhauser at Comerco. Exh. A–26, p. 2. When Comerco at first determined it had no interest in Clorox, Beelitz informed Clorox that Comerco was considering different options, but that Comerco's shareholders were aware of Clorox's interest and, should Comerco change its present situation, negotiations between the two companies could proceed.

This ended Train's and Beelitz' role in the transaction, but they had accomplished precisely what Ardshiel had hoped Train

could do: identify a prospective and interested buyer.

There is no indication that Ardshiel wished Train or Beelitz to make a formal introduction between principals. Ardshiel was in fairly constant contact with Train and Beelitz throughout the period the two were making contacts, and in fact had to obtain Comerco's approval for Train or Beelitz before a contact could be made. Thus Ardshiel remained a significant part of that "finding" effort as well as continuing its own efforts independently of Train and Beelitz. Once Ardshiel knew Clorox was interested, it could readily make subsequent introductions itself. The fact remains that Beelitz identified Clorox as a buyer, contacted Clorox and stimulated its interest.

Through these efforts, Train met his obligations under the agreement.

That it was done through Beelitz' actions is immaterial. Train contacted Beelitz because he was a friend who had connections with European businesses. Beelitz acted as Train's colleague and on his behalf. He anticipated that this would in turn put him in a position to have his employer, Morgan Guaranty, act as investment banker in the ultimate transaction, receiving its fee from the buyer. That does not mean Beelitz was representing adverse interests, as defendants assert. It was not inappropriate for him to act as unpaid finder for Train and hope to obtain the resulting investment banking business from the buyer for his employer. His position was fully disclosed, and does not bar the finding that Train delivered the benefits of his activities to Ardshiel. "If a transaction ultimately entered upon is a direct result of the disclosure of the opportunity by the finder the latter is entitled to his compensation." *Simon v. Electrospace Corp.*, 299 N.Y.S.2d at 717.

The result is not changed by the temporary death of the deal in August 1980, its revival by the principals of the two corporations without any further efforts by Train or Beelitz, and the second hiatus in January 1981 before the acquisition was accomplished. All that is necessary is a "continuing connection between plaintiff's initial efforts and the [transaction] that came about." *Simon v. Electrospace Corp.*, 320 N.Y.S.2d at 229.

## CONCLUSION

 Train incorporated Vantage International in April 1980, two months after the agreement was entered into. Train did not mention Vantage International to defendants in February 1980 in connection with the agreement or indicate to them that Vantage would participate with Train in satisfying his part of the agreement. It was not a party to the agreement with Ardshiel, and its claim is dismissed.

Judgment will be entered in favor of plaintiff Train in the amount of $493,750, plus prejudgment interest and costs according to law, execution thereof to be in accordance with the terms of the parties' Stipulation in open court (tr. 478) and counsels' letters of February 27, 1986.