**BUSHKIN ASSOCIATES, INC. and Merle J. Bushkin, Plaintiffs,**

v.

**RAYTHEON COMPANY, Defendant.**

No. CA 81–1101–T.

United States District Court, D. Massachusetts.

Sept. 2, 1983.

Thomas E. Cargill, Jr., Edward I. Masterman, Dana Hanson, Neil Tully, Cargill & Masterman, Boston, Mass., for defendant.

John R. Hally, Alan D. Rose, Nutter, McClennen & Fish, Boston, Mass., for plaintiffs.

## OPINION

TAURO, District Judge.

The plaintiffs, Bushkin Associates, Inc. and Merle Bushkin ("Bushkin"), brought suit to recover on an oral fee agreement allegedly made between Bushkin and the defendant Raytheon Company ("Raytheon") for services in connection with Raytheon's acquisition of Beech Aircraft Corporation ("Beech"). The complaint also contains a count seeking payment for the reasonable value of any information Bushkin gave Raytheon, and a count alleging violations by Raytheon of Mass.Gen.Laws ch. 93A (1972). Raytheon has moved for summary judgment, arguing that the New York statute of frauds should apply to this case and that, under its provisions, the oral agreement alleged here would be unenforceable. Bushkin responds that the Massachusetts statute of frauds should be applied, and that its provisions would not invalidate the oral agreement alleged here.

## I. *Factual Background.*[1]

Bushkin, a New York resident, is an investment banker specializing in mergers and acquisitions. He is the president of Bushkin Associates, a corporation organized and based in New York. Raytheon is a Delaware corporation with its principal place of business in Massachusetts.

Bushkin's dealings with Raytheon concerning possible mergers and acquisitions began in 1971. In 1974, Bushkin discovered that Beech might be available for acquisition. He attended a meeting in January, 1974, with Olive Ann Beech and Frank Hedrick, the president and vice president respectively of Beech, at which he learned some information regarding the type of merger that might interest them.[2]

On May 21, 1974, Bushkin, in New York, telephoned Robert Seaman, a vice president of Raytheon, in Massachusetts, to ask if Raytheon would be interested in acquiring a general aviation company. Seaman replied that Raytheon might be interested if the company were either Cessna or Beech. Seaman followed up with a May 24 letter to Bushkin, stating that Raytheon's interest in a general aviation company was uncertain. During a July 19, 1974, telephone conference, Seaman told Bushkin that it was unlikely that Raytheon would have an interest in a general aviation company.

The next conversation on the subject, and the one in which Bushkin alleges the oral fee agreement was made, occurred on January 28, 1975. Bushkin apparently telephoned Seaman (or Seaman returned Bushkin's call). In either event, Bushkin was in New York and Seaman in Boston. Bushkin asked if Raytheon were still interested in general aviation. Seaman replied yes, if the company were Beech or Cessna. Bushkin stated that he could reveal the name of the company, but first wanted to discuss a fee arrangement. Seaman told Bushkin that if Raytheon consummated an acquisition of the company Bushkin was discussing, Raytheon would pay a fee of one percent of the value of the transaction. Bushkin replied, "fine," and then identified the company as Beech.[3] He went on to disclose information as to his understanding of the kind of acquisition or merger that Beech wanted.

Seaman and Bushkin had a few more contacts with regard to Beech and, on June 27, 1975, Seaman presented Beech as a possible acquisition candidate to Thomas Phillips, Raytheon's chairman of the board. An internal Raytheon "acquisition log," dated June 19, 1975, identifies Bushkin as the person who offered or suggested Beech as a candidate. On June 30, Seaman called Bushkin to report on the presentation, and to discuss various aspects of a possible Raytheon acquisition of Beech. Later that day, Seaman sent a memo to Phillips summarizing relevant aspects of his conversation with Bushkin.[4] In the memo, Bushkin was identified as "our contact in this matter."

In a telephone conversation on July 29, 1975, Seaman told Bushkin that Raytheon had decided it was not interested in pursuing Beech as an acquisition candidate.

1. Although Raytheon disputes many aspects of Bushkin's account of the facts relevant to this case, Raytheon is willing to, and indeed must, resolve any genuine disputes of fact in Bushkin's favor for the purposes of its motion for summary judgment. The following factual background, therefore, adopts Bushkin's version of any genuinely disputed facts.

2. This meeting was arranged by Howard Suslak and Fred Schreier, principals of MacDonald & Co., Inc. MacDonald & Co. has an agreement with Bushkin whereby it will receive a share of any award Bushkin might recover from Raytheon.

3. The day before this conversation, Bushkin discussed Beech as a possible acquisition candidate, and allegedly entered into an oral fee agreement, with another company, Northwest Industries. After his conversation with Seaman, up until August 1979, Bushkin sought to interest several other companies in Beech.

4. Bushkin told Seaman that Mrs. Beech was interested in a tax-free transaction, and dividend payouts to her and members of her family; that Beech was looking to develop a jet of its own, and believed that this kind of project could be better accomplished if it had the backing of a larger and financially stronger company; and that Beech wanted the Beech name to survive.

Bushkin had subsequent contacts with Seaman and Phillips with regard to possible acquisition candidates other than Beech. On one occasion in November 1975 Bushkin broached the subject of Beech with Phillips (in the course of discussions about another candidate), and Phillips replied that he was not interested.

On September 1, 1976, Raytheon entered into a written agreement with Lonsdale Enterprises, Inc., and its principals Royal Little and James Robison, for consulting services in connection with Raytheon's interest in mergers and acquisitions. About three months later, in letters to Phillips dated November 29 and December 9, 1976, Little and Robison suggested Beech as a possible acquisition candidate. Phillips' first reaction was not enthusiastic, but by February 16, 1977, Phillips indicated that he wanted to meet with Olive Beech. On February 28, while Bushkin was meeting with Phillips concerning another company, Bushkin again mentioned Beech, but Phillips said he was not interested. Nonetheless, on March 3, Phillips authorized Little and Robison to contact Beech through their business associate Angus MacDonald. In June, 1977, it became public knowledge that Beech was negotiating a merger with General Dynamics, and Raytheon, therefore, dropped the matter until those negotiations fell through.

Phillips finally met with Frank Hedrick, vice president of Beech, on January 24, 1978, and with Olive Beech on July 12, 1978. After further negotiations and studies, Raytheon and Beech reached a preliminary agreement on October 1, 1979. Raytheon subsequently entered written agreements, dated November 26, 1979, to pay Lonsdale and MacDonald $600,000 and $500,000 respectively for their services in connection with the merger. The agreements were contingent on its consummation.

In February, 1980, Raytheon acquired Beech. The value of the transaction was approximately $800,000,000.00.

## II. *Choice of Law.*

 The question of whether New York or Massachusetts law governs the parties' alleged oral agreement is crucial. Under the New York statute of frauds, an oral agreement to pay compensation for services rendered in connection with the sale of a business, or an interest therein, is void.[5] Massachusetts has no comparable invalidating provision in its statute of frauds.

 Under *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal court having diversity jurisdiction must apply the choice of law rules of the forum state. Bushkin argues that, in a contract action, the Massachusetts rule is that the law of the place where the contract was made governs. *See Dicker v. Klein*, 360 Mass. 735, 277 N.E.2d 514, 515, 516 (1972); *Molinar v. Western Electric Co.*, 525 F.2d 521 (1st Cir.1975). Building on that premise, Bushkin's thesis is that the oral contract here was made in Massachusetts, that Massachusetts law applies, and that the oral fee agreement is, therefore, valid.

Raytheon responds that the Massachusetts Supreme Judicial Court (SJC) has indicated that it is ready to abandon its "place-of-making" rule in favor of "a more functional approach" in determining what law

---

**5.** The relevant portion of the New York statute states:

 a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

 \* \* \* \* \* \*

 10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . .

New York General Obligations Law § 5–701.

to apply in contract cases. *Choate, Hall & Stewart v. SCA Services, Inc.,* 378 Mass. 535, 392 N.E.2d 1045, 1048–49 (1979).[6] In *Choate, Hall,* the SJC recognized that the place-of-making rule "can produce awkward or arbitrary results," and that most states had abandoned such one-factor tests. *Id.* The SJC continued, however, that "the facts of the present case deprive us of an opportunity to elect among the extant doctrines," because the same result would be reached regardless of what choice of law rule were applied. *Id.* at 1049.

Picking up on this discussion in *Choate, Hall,* one federal court subsequently predicted that the SJC would, when squarely confronted with the question, abandon the place-of-making rule in favor of a more functional approach. *McKinney v. National Dairy Council,* 491 F.Supp. 1108, 1112 (D.Mass.1980).[7] In *McKinney* the court applied the choice of law principles set forth in the **Restatement (Second) of Conflict of Laws** (1971).[8]

This court respectfully anticipates that the SJC will discard the strict requirements of the place-of-making rule when next confronted with the issue. The facts of this case provide an example of the rule's indiscriminate impact, and a strong argument for its abandonment.

The alleged oral agreement was entered into during a phone call from Bushkin in New York to Seaman in Massachusetts. Bushkin said he could reveal the name of the possible acquisition candidate, but wanted a fee arrangement first. Seaman said the fee would be one percent if the deal were consummated. Bushkin then identified the company as Beech. These simple facts give rise to an interesting issue of contract law. Did Bushkin make an offer that was accepted by Seaman, thereby making a Massachusetts contract? Or did Bushkin set negotiating terms, resulting in an offer by Seaman that, when accepted by Bushkin, made a New York contract? A reasonable argument could be made for either position. Under the place-of-making rule, the resolution of that issue would control the conflict of laws question in this case.

A little fine tuning of the underlying facts demonstrates how senseless it would be in this age of sophisticated business technology to permit the rights of the parties here to be determined by what would essentially be a toss of the coin characterization of a conversation between Bushkin and Seaman. Suppose, for example, that the conversation had not taken place with Seaman in his office in Massachusetts but, instead, Seaman had returned Bushkin's call during a short layover at an airport in Chicago. Assume further that the conversation were characterized by this court as an offer by Bushkin that was accepted by Seaman. Would Bushkin then have this court apply Illinois law to that contract merely because the telephone used by Seaman was in Illinois? That not unreasonable variation of the underlying facts here underscores the SJC's concern over the "awkward or arbitrary results" that can be produced by the place-of-making rule. *Choate, Hall,* 392 N.E.2d at 1048.

The court in *McKinney,* 491 F.Supp. 1108, while recognizing that the SJC might "define its details" differently, turned to the **Restatement Second** formulation of choice of law principles. *Id.* at 1112.[9] The **Restatement Second** sets out general principles to guide choice of law as a whole, and

---

**6.** Raytheon also argues that, in any event, the contract was made in New York. Its primary argument, however, is its contention that the place-of-making rule would no longer be applied by the SJC.

**7.** The Massachusetts Appeals Court has also interpreted *Choate, Hall* as a rejection of one-factor choice of law tests in favor of a "more functional approach." *Rudow v. Fogel,* 12 Mass.App. 430, 426 N.E.2d 155, 158–9 (1981).

**8.** The court in *McKinney* also found that "even if the old place-of-making rule were applied, the result, with respect to the issue of which jurisdiction's statute of frauds law would apply, would be the same." 491 F.Supp. at 1112 n. 2.

**9.** The SJC identified the **Restatement Second** approach as one alternative to the place-of-making rule. *Choate, Hall,* 392 N.E.2d at 1049.

then sets out more specific factors to consider in various particular areas of law.[10] In contract cases, the **Restatement Second** looks to determine "the state which . . . has the most significant relationship to the transaction and the parties," and identifies five contacts to consider in determining the most significant relationship. **Restatement Second** § 188.

One hazard of this approach is the risk that its application could degenerate into little more than mechanical contact counting. Choice of law issues should be resolved by qualitative analysis, and not merely by quantitative considerations.

Another drawback is that the **Restatement Second** approach presupposes that the locations of contacts can be definitively identified and will, therefore, identify a single state as having the most significant relationship. The fact of corporate life in the 1980s, however, is that many business contacts and transactions are multi-state in character. In the instant case, for example, it is not possible to determine a single state as the place of contracting, negotiation, performance, or subject matter. With regard to each of these elements, there is some relationship to two or more states.[11] The

fifth element set out by the Restatement Second is residence or domicile. Bushkin is a New York resident, Raytheon a Massachusetts resident. This diversity of residence is where the choice of law difficulty arose in the first place. Clearly, therefore, the **Restatement Second** approach is not an effective means for resolving the choice of law problem in this case.

In addition to the **Restatement Second** approach, the SJC also referred to "interest analysis" as an alternative to the old place-of-making rule. *Choate, Hall,* 392 N.E.2d at 1049. Under this approach, one looks to the policies underlying each state's substantive law. The facts of the case are then analyzed in light of these policies to determine whether the state has a policy that would demonstrate its interest in having its substantive law applied to those facts. Such an approach can be of assistance in ferreting out material conflicts between the laws of different states, as opposed to those differences which may have no substantive import in a particular case. For example, if Bushkin and Raytheon were both New York residents, but Seaman happened to make a phone call to Bushkin from an airport in Chicago during which an "Illinois"

---

**10.** The **Restatement Second** § 6 states that the factors relevant to the choice of the applicable rule of law include

 (a) the needs of the interstate and international systems,

 (b) the relevant policies of the forum,

 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

 (d) the protection of justified expectations,

 (e) the basic policies underlying the particular field of law,

 (f) certainty, predictability and uniformity of result, and

 (g) ease in the determination and application of the law to be applied.

**Restatement Second** § 188 provides in relevant part:

 (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

 (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to

be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place of contracting,

 (b) the place of negotiation of the contract,

 (c) the place of performance,

 (d) the location of the subject matter of the contract, and

 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

**11.** The place of contracting is, essentially, a phone line between Massachusetts and New York. The place of negotiation is Massachusetts and New York. The place of performance is, at least, Massachusetts, New York, and Kansas (the location and place of incorporation of Beech). The subject matter of the contract is services. To the extent one can speak of the "location" of such a subject matter, the location is the place the services are rendered, in this case Massachusetts, New York and Kansas.

contract was made, New York would clearly be the only state with an interest in applying its statute of frauds.

Interest analysis has a more difficult time, however, when the parties are from different states. To the extent that interest analysis conceives of a state's laws as partisan and resident oriented, then its application in diversity cases is of doubtful benefit. New York's statute of frauds, for example, may be perceived as having been designed to protect identifiable defendants who are sued on oral contracts. Massachusetts, whose statute of frauds would not invalidate the same oral contract, could be seen as interested in protecting plaintiffs who sue on such contracts. If New York's interest is only in protecting New York defendants, and Massachusetts' interest only in protecting Massachusetts plaintiffs, a problem arises when the parties are diverse.[12]

Interest analysis, therefore, must be recognized as a resource that may not always provide the answer. Its deficiencies could be minimized somewhat, however, by broadening the scope of analysis so as to arrive at a less simplistic and more realistic measure of a state's interest or purpose in passing a law. Some state laws are clearly parochial and resident oriented. Others are designed to have more expansive and less discriminate impact. Determining the projected scope of a law by application of an expanded interest analysis may assist in resolving choice of law issues. It certainly does in this case.

The purposes underlying the relevant part of the New York statute of frauds have been memorialized by legislative history and New York court decisions. In proposing this section of the statute of frauds, the Law Revision Commission stated:

> In recent years there have been a substantial number of reported cases of claims for commissions for services rendered in the sale of a going business or a business opportunity. Under existing law there is no requirement that business brokers' contracts for commissions be in writing. The nature of the transactions is such that, in the absence of the requirement of a writing, unfounded and multiple claims for commissions are frequently asserted, and employers often seek to escape liability by denying the fact of employment. These controversies are commonly resolved by juries on conflicting testimony, with the consequent danger of erroneous verdicts.

1949 Report of N.Y.Law Rev.Comm., N.Y. Legis.Doc., 1949, No. 65(g), p. 615, *quoted in Intercontinental Planning, Ltd. v. Daystrom,* 24 N.Y.2d 372, 383, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). This report indicates that the statute of frauds provision seeks to protect the principals in the sale of a business from unfounded brokers and finders claims, and to encourage certainty through the use of written fee agreements.

The New York Court of Appeals, citing the policy of protecting principals in the sale of a business from unfounded claims, explained that this purpose extends beyond simply benefiting New York residents.

> This policy would include foreign principals who utilize New York brokers or finders because of the nature of the brokerage business as it is conducted here. It is common knowledge that New York is a national and international center for the purchase and sale of businesses and interests therein. We conclude therefore that the Legislature in enacting subdivision 10 of former section 31 intended to protect not only its own residents, but also those who come into New York and take advantage of our position as an international clearing house and market place. This is true because of all the jurisdictions involved, New York law af-

---

**12.** Interest analysis has come under attack to the extent it postulates that a state has an interest in applying laws that benefit a plaintiff or defendant *only* when that plaintiff or defendant is a resident of that state. *See, e.g.,* Brilmayer, "Interest Analysis and the Myth of Legislative Intent," 78 *Mich.L.Rev.* 392 (1980). When both plaintiff and defendant are from the same state, however, that state's legislative balance of competing domestic interests is clearly valid.

fords the foreign principals the greatest degree of protection against the unfounded claims of brokers and finders. This encourages the use of New York brokers and finders by foreign principals and contributes to the economic development of our State. Our brokers and finders need only ensure that their agreements for compensation comply with the Statute of Frauds to receive the benefits of New York's position as a business center.

*Intercontinental Planning,* 24 N.Y.2d at 383–84, 300 N.Y.S.2d 817, 248 N.E.2d 576.

■ Bushkin, as a New York City investment adviser, falls into the heart of New York's interest in maintaining and encouraging New York's position as a business center. Bushkin's place of business is in New York. He solicited Raytheon's interest in Beech from New York. Bushkin is a part of the "international clearing house and market place" of New York. The New York Court of Appeals has made clear that New York's protection against unfounded claims extends to foreign principals, even at the expense of New York brokers and finders. One purpose of relevant New York law is to encourage out-of-state companies like Raytheon to rely on New York as a stable financial center.

Massachusetts, in contrast, has at most a minimal interest in applying its law to this case. As a general matter of policy, states look to uphold contracts and give parties the benefit of their agreement. Unlike New York, Massachusetts has not chosen to except oral agreements concerning compensation for services in connection with the sale of a business from that policy. The rules governing Massachusetts' business community of brokers and finders are thus structured differently from those in New York. But the soundness of Massachusetts policy or the stability of its financial community is not at issue here. What is at issue is whether a New York finder, soliciting business and selling services from New York, may then seek to avoid the laws of his own jurisdiction. New York's enunciated policy is to protect foreign principals from unmemorialized contracts, even at the expense of New York brokers and finders. In this context, Massachusetts has no interest in denying that protection to a Massachusetts company. Expanded interest analysis clearly tips the scale in favor of applying New York law to the facts of this case.[13]

## III. *Merits.*

■ Applying New York law to this case, the court finds that Raytheon's motion for summary judgment must be granted. There is no doubt that the New York statute of frauds invalidates the oral agreement alleged by Bushkin. The oral agreement alleged is a "contract to pay compensation for services rendered . . . in negotiating the purchase : . . of a business opportunity, business . . . or an interest therein, including a majority of the voting stock interest in a corporation . . . ." New York General Obligations Law § 5–701. Such a contract is void under the New York statute of frauds. *Id.* The New York Court of Appeals has held that this provision "applies to claims for fees by finders as well as brokers." *Intercontinental Planning,* 24 N.Y.2d at 378, 300 N.Y.S.2d 817, 248 N.E.2d 576, *citing Minichiello v. Royal Business Funds Corp.,* 18 N.Y.2d 521, 527, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966). The New York Appellate Division recently dismissed a complaint in which Bushkin alleged an

---

**13.** The application of Massachusetts law here would also create an anomalous non-uniformity of results between forums. The relevant precedents make clear that the New York courts would apply the New York statute of frauds to the oral fee agreement at issue in this case. *See Intercontinental Planning,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576. Further, in *Bushkin Associates v. U.S. Filter,* 79 A.D.2d 367, 436 N.Y.S.2d 651, *aff'd.* 55 N.Y.2d 763, 447 N.Y.S.2d 245, 431 N.E.2d 970 (1981), decided about six weeks before the present action was filed, the New York Appellate Division found that an oral fee agreement alleged by Bushkin Associates, similar to the agreement here, was barred by the New York statute of frauds. To allow Bushkin and other New York finders, in identical cases, to receive better treatment in other states than in their home forum would not only be anomalous, it would encourage a rush of forum-shopping.

oral agreement very similar to that alleged here, on the basis that the oral agreement was barred by the statute of frauds. *Bushkin Associates v. U.S. Filter,* 79 A.D.2d 367, 436 N.Y.2d 651, aff'd. 55 N.Y.2d 763, 447 N.Y.S.2d 245, 431 N.E.2d 970 (1981). The oral agreement between Bushkin and Raytheon is thus void and unenforceable.

Bushkin also brings an implied contract claim, seeking the reasonable value of information and services given to Raytheon. This claim, like the express contract claim, is barred by the New York statute of frauds. After invalidating oral agreements to pay fees for services in connection with the purchase or sale of a business, the New York statute continues, "This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . ." New York General Obligations Law § 5–701. Indeed, even before this sentence was added to the statute of frauds, the New York Court of Appeals held that "to allow recovery for the reasonable value of these [finder's] services is to substantially defeat the writing requirement." *Minichiello,* 18 N.Y.2d at 527, 277 N.Y.S.2d 268, 223 N.E.2d 793. Bushkin's implied contract claim, then, must also fall.

Finally, Bushkin alleges that Raytheon engaged in unfair and deceptive acts and practices, in violation of Mass.Gen.Laws ch. 93A (1972). This claim is based on Raytheon's actions in (1) not living up to its oral fee agreement, and (2) using the information acquired pursuant to the oral fee agreement without paying for that information. These allegations do no more than restate. Bushkin's express and implied contract counts in the form of a ch. 93A claim. Once the contract counts fall, the ch. 93A claim must fall also. One cannot say that it is an unfair or deceptive practice not to honor a void contract. Further, to allow Bushkin to circumvent the statute of frauds by proceeding on the contract claims in another form would undercut the whole design of the statute of frauds.

For these reasons, Raytheon's motion for summary judgment will be allowed, and Bushkin's complaint dismissed.