**BUSHKIN ASSOCIATES, INC. and Merle J. Bushkin, Plaintiffs, Appellants,**

v.

**RAYTHEON COMPANY, Defendant, Appellee.**

**Nos. 86–1025, 86–1326.**

United States Court of Appeals, First Circuit.

Argued Dec. 2, 1986.

Decided March 20, 1987.

David J. Fine, with whom Silverglate, Gertner, Baker, Fine, Good & Mizner, Boston, Mass., was on brief, for plaintiffs, appellants.

Neal C. Tully, with whom Edward I. Masterman and Cargill, Masterman & Culbert, Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiffs-appellants Merle J. Bushkin and Bushkin Associates, Inc., appeal from a directed verdict in their suit against defendant-appellee Raytheon Company. Appellants, an investment banker and his firm, originally commenced this suit in United States District Court for the District of Massachusetts in 1981. They sought damages from Raytheon, on theories of express and implied contract, in connection with their role in the merger of Raytheon with Beech Aircraft Corporation.[1] In 1983, Raytheon was granted a motion for summary judgment by the district court. *See* 570 F.Supp. 596 (D.Mass.1983). We overturned that judgment and certified the case to the Massachusetts Supreme Judicial Court for

---

1. Plaintiffs also sought relief under Mass.Gen. Laws Ann. ch. 93A (West 1984). This claim was eliminated by the decision of the Massachusetts Supreme Judicial Court in *Bushkin Associates, Inc. v. Raytheon,* 393 Mass. 622, 473 N.E.2d 662 (1985).

decisions on choice of law and other questions. After the decision by the state court, *see* 393 Mass. 622, 473 N.E.2d 662 (1985), the suit again went to trial in district court. In December, 1985, upon conclusion of the presentation of plaintiffs' case, the district court directed a verdict for defendant on all counts. This decision forms the subject of the present appeal.

## I. SUMMARY OF FACTS

In reviewing a motion for a directed verdict, we must give the losing party "the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1499, 8 L.Ed.2d 777 (1962) (citing 5 Moore's Federal Practice 2316 (2d ed. 1951)). While the parties have not engaged on appeal in much dispute over the facts, they have vigorously argued about the context in which those facts should be viewed. Our summary of the facts must present them in the light most favorable to Bushkin.

In May, 1974, Bushkin asked Robert L. Seaman, Raytheon's vice-president for planning, if Raytheon would be interested in acquiring a company in the field of general aviation. In July, 1974, Seaman stated that it would be unlikely that Raytheon would have such an interest.

On January 28, 1975, Bushkin again spoke to Seaman about the same subject. Before revealing the name of the company he had in mind, Bushkin declared that "it would be appropriate to settle the issue of fee first." Testimony of Merle J. Bushkin, Plaintiffs' Appendix (App.) at 194. In Bushkin's words, "I set an appropriate fee on a transaction of that size which would be one percent." *Id.* at 194–95. Seaman said

> that if Raytheon acquired the company and if Raytheon did not have a prior commitment with regard to that company, that Raytheon would pay a one percent fee and would work through Bushkin Associates....

*Id.* at 195. Neither Bushkin nor Seaman discussed a time term for this fee agreement. Bushkin then told Seaman that the company in question was Beech Aircraft. He proceeded to describe to Seaman the various conditions that Beech was setting for a takeover. Bushkin had obtained this information while researching Beech for another client. Seaman said that "he was very interested in Beech" and that he hadn't known it was available for acquisition. Seaman told Bushkin that he would discuss Beech with Thomas L. Phillips, chief executive officer of Raytheon. Bushkin's claim of an express contract is primarily based on this conversation.

Bushkin and Seaman had several more conversations before the presentation of Beech to Phillips. In an entry in Raytheon's "Acquisition Log," Beech was listed under the "Acquisition" column and Bushkin was listed under the "Offered/Suggested By" column. The page in the log is dated June 19, 1975; the entry is dated June 17, 1975. On June 27, 1975, Seaman made a presentation to Phillips about Beech. On June 30, Seaman spoke to Bushkin and asked him several questions that Phillips had about Beech. These questions concerned the reasons for Beech's interest in a merger. A memo from Seaman to Phillips, dated June 30, 1975, reported this conversation. The memo referred to Bushkin as "our contact on this matter." On July 11, 1975, Bushkin discussed with Seaman the structure of the proposed transaction and sent him a memo on the subject. On July 29, 1975, however, Seaman told Bushkin that Phillips was not interested in Beech. Phillips confirmed this lack of interest in acquiring Beech in a conversation with Bushkin on November 6, 1975.

In September, 1976, Raytheon retained Lonsdale Enterprises, Inc. (Lonsdale), as a consultant in Raytheon's diversification program. On November 29, 1976, Phillips' office received a letter from Royal Little, a partner in Lonsdale Enterprises. The letter suggested Beech as a potential acquisition for Raytheon.

Angus MacDonald, an independent broker working with Lonsdale, testified by deposition that he had a conversation with

Phillips about Beech on December 1, 1976.[2] He discussed the advantages to Raytheon of a merger with Beech and gave Phillips written information about Beech. Mac-Donald testified that Phillips replied: "It does look very interesting, and let me think about it. Let me talk it over with our people." On February 16, 1977, Phillips telephoned Little and said that he wanted to meet Olive Beech, the chairman of Beech Aircraft, and that he was very interested in taking over the company.[3]

On February 28, 1977, Bushkin once again raised the subject of Beech with Phillips. According to Bushkin, Phillips "dismissed it saying he had no interest in general aviation." App. at 275.

On or shortly before March 3, 1977, Phillips authorized representatives of Lonsdale Enterprises to contact Beech. A series of meetings eventually took place in 1978 between Phillips and Frank Hedrick, Beech's president. A merger agreement was signed in November, 1979; the merger became effective in February, 1980.

The value of the Raytheon-Beech transaction was somewhere between $815 and $816 million. In connection with the transaction, Raytheon and Beech paid $7,693,138 in fees to various investment bankers and financial advisors. Raytheon paid $500,000 to Angus MacDonald, $600,000 to Lonsdale, and $2.5 million to Lazard Freres. Beech paid $3,819,171 to Shearson Loeb Rhoades,

Inc., and $273,967 to other financial advisors.

## II. EXPRESS CONTRACT

The district court held that there was sufficient evidence for the jury to have found an express contract between Bushkin and Raytheon, based primarily on the conversation between Bushkin and Seaman on January 28, 1975. Raytheon has objected that Seaman had no authority to bind Raytheon to agreements with investment bankers and brokers. We agree with the district court, however, that sufficient evidence was presented for the jury to have concluded that Seaman at least had apparent authority to enter into such agreements. Such evidence includes the general authority apparently vested in Seaman by Raytheon to negotiate with investment bankers and brokers, as well as specific statements made by another Raytheon vice-president to Bushkin that Seaman would be responsible for such matters.

The central issue in the interpretation of the contract concerns the missing time term. As we noted, neither Bushkin nor Seaman mentioned a time term during their January 28 conversation. At trial, Bushkin testified that his practice during the period in question was to ask for a time term of "two years plus continuing negotiations." He declared that he expected the same time term for the contract with Raytheon. Bushkin acknowledged that the phrase

**2.** MacDonald's testimony was given in a pretrial deposition and was submitted to the district court as part of plaintiffs' motion to reopen the evidence. Raytheon argues that this testimony, submitted after the judge had indicated he would grant a motion for a directed verdict on the express contract claim, is not properly before us. We agree that the district court rejected plaintiffs' motion to reopen. The district judge, however, examined the deposition testimony. His refusal to reopen the evidence was primarily based on a consideration of the impact of the deposition testimony on the merits of the directed verdict motion, rather than on procedural considerations. *See* App. at 1080 ("[T]his testimony if it were admitted, would not change anything. So I am going to deny the motion."). *See generally* App. at 1071–80 (argument on motion to reopen). The motion to reopen, and the deposition testimony appended to it, are part of the record on appeal. *See*

Fed.R.App.P. 10 (record on appeal consists of "the original papers and exhibits filed in the district court"); 9 Moore's Federal Practice ¶ 210.04[1] (2d ed. 1986) (Fed.R.App.P. 10 refers to any document made part of the proceedings before the district court). We stress that this is not a situation of a denial of a motion to reopen simply on the grounds that plaintiff had the opportunity to offer the evidence during the presentation of his case. The directed verdict was in part based on the district court's consideration of the substance of the deposition testimony. We must, therefore, consider that testimony in reviewing the district court's grant of the motion for a directed verdict.

**3.** The content of this telephone conversation was described in an internal Lonsdale memo from Little to his partner. On cross-examination, Phillips accepted this memo as a report of the conversation.

"continuing negotiations" was somewhat unclear. He asserted, however, that by "continuing negotiations" he meant "continuing interest": the term of the contract would be for two years, but, if the acquisition was not completed within that time, the contract would continue until the date of the acquisition provided that the company's interest arose within the two-year period. In the present case, it seems clear from Phillips' statements in July and November, 1975, that Raytheon's desire to acquire Beech, as expressed by Seaman in January, 1975, went into a period of dormancy for at least a year. For the contract to have lasted more than two years, therefore, Raytheon's interest would have had to have been reawakened before January 28, 1977, and to have continued beyond that date.

Appellants, despite Bushkin's testimony at trial, strongly contend that the "two years plus" standard is inappropriate here. They argue, correctly, that contracts depend on objective manifestations of consent and not on uncommunicated subjective expectations. Thus, they conclude, even if we were to accept that Bushkin had an expectation of "two years plus," this expectation would not be binding evidence on the duration of the contract. Since no time term was explicitly discussed, appellants contend that the district court should have submitted the matter to the jury based on the standard of a "reasonable time." Such a "reasonable time" should have been determined on the basis of all the evidence, particularly, appellants urge, the testimony of their expert, Stanley Foster Reed.

The district court, we note, did not hold that Bushkin's testimony conclusively proved a "two years plus" time term. Rather, the court held that the testimony precluded a showing, based on trade usage, of a *longer* time term. Citing *Caggiano v. Marchegiano*, 327 Mass. 574, 99 N.E.2d 861 (1951), the court held that a trade usage must be universal in order to supplement the missing terms of a contract and that Bushkin's own practice and expectations showed that a period other than "two years plus" could not have been universal.

We have reservations about the district court's focus on the language in *Caggiano* as the legal standard for trade usage. First, the contract in *Caggiano* failed to specify the "rights and obligations of either party," *id.* 99 N.E.2d at 865; the court construed the agreement as a contract which contemplated a more formal contract and was itself lacking any definite, enforceable terms. By contrast, the missing provision here was the time term. The case law is clear that, when a contract is silent as to time, the term shall be a reasonable time based on all the relevant evidence. *See, e.g., H. Piken & Co. v. Planet Construction Co.*, 3 Mass.App.Ct. 246, 326 N.E.2d 725 (1975); *MacDonald & Payne Machine Co. v. Metallic Arts of New England, Inc.*, 324 Mass. 353, 86 N.E.2d 516, 518 (1949). Second, we find that the standard for a showing of trade usage set forth in *Caggiano* was modified by Massachusetts' adoption of the Uniform Commercial Code, codified at Mass.Gen.Laws Ann. ch. 106 (West 1958). *Cf. DiMarzo v. American Mutual Ins. Co.*, 389 Mass. 85, 449 N.E.2d 1189, 1201 n. 20 (1983) (noting modification of *Caggiano* by U.C.C. with regard to admissibility of evidence of trade usage). The Massachusetts Code Comment to § 1–205(3) explicitly rejects *Caggiano*'s requirement "that the usage be old; recent usages also qualify." The Uniform Commercial Code Comment on § 1–205(2) states that "full recognition is ... available for new usages and for usages currently observed by the great majority of decent dealers, even though dissidents ready to cut corners do not agree." Rather than a strict "universality" standard, we find that the appropriate Massachusetts standard is a "practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts." Mass.Gen.Laws Ann. ch. 106, § 1–205(3). *Cf. Thibeault v. Pickering*, 2 Mass.App.Ct. 421, 313 N.E.2d 586, 588 (1974).

█ While we take issue with the district court's precise formulation of the legal

standard, we agree with its holding that appellants did not present sufficient evidence to support a finding of a contract lasting more than "two years plus." Bushkin's own testimony concerning his own practice and general usage was quite strong on this point. Moreover, Bushkin proposed a "two years plus" provision to Raytheon in connection with other potential acquisitions. Bushkin's experience and background in the field lend great weight to his testimony.[4]

Appellants primarily refer to two kinds of evidence to support their contention that a genuine issue remains concerning the time term. First, they argue that the testimony of their expert, Stanley Foster Reed, could have supported a finding of a five-year obligation. Reed's testimony, however, did not primarily concern the provisions of the express contract. Rather, depending on the interpretation, Reed's testimony was either focused on a contract implied in fact or a contract implied in law. *See infra* at 150. Insofar as it directly related to the express contract, Reed's testimony consisted of a hypothetical opinion, which assumed the existence of an express contract, about the reasonableness of the fee. Bushkin's attorney, in his final redirect examination of Reed, concentrated on showing that Reed's testimony was primarily directed to the quantum meruit claim.

Reed's only clear statement about a five-year obligation came during cross-examination by Raytheon's attorney. Neither the attorney nor Reed specified whether this "obligation" was for a contract implied in law or in fact or for an express contract. Reed, however, stated several times during his testimony that the overall opinion he formed about the case did not rely upon the express agreement and, indeed, was completely independent of it. We assume, therefore, that his answer concerning the five-year obligation was part of this overall

view of the case. It certainly could not reasonably overcome Bushkin's clear testimony about his general practice and about the specific contract at issue here.

Second, appellants point to a Raytheon statement, made in the course of an exchange of letters with Bushkin in 1976, concerning its views on its obligations to brokers. Appellants contend that the statement shows that Raytheon saw its obligations to brokers as lasting at least three or four years. Bushkin had suggested two companies, Cameron Iron Works and Harnischfeger, as possible acquisition candidates. Seaman wrote in response:

> We have a record of previous interest on Cameron Iron Works, and are obligated to another broker.

> Also, we have studied and declined interest in Harnischfeger a number of times in the past years. If our interest was to be rekindled, it would be appropriate for us to check with those who have given us the previous recommendations.

Raytheon's internal memos indicate that the proposals made by other brokers dated back three years for Cameron Iron Works and four years for Harnischfeger. Bushkin, who was not aware of the nature of these other proposals, wrote back:

> If another firm has presented Harnischfeger to you within the past two years and you have an obligation to them, it indeed would be inappropriate for Bushkin Associates, Inc. to become involved. However, if the most recent submission dates back four or five years, it would be unreasonable to expect that an obligation still exists—and it would be appropriate for Bushkin Associates, Inc. to act on your behalf. Given this generally accepted standard—namely, that an obligation lasts two years—please let me know if it is appropriate for me to speak

4. Further evidence of a trade practice of a time term of approximately two years was provided by the provisions of the consulting agreement between Lonsdale and Raytheon. The agreement stated that Lonsdale would not be entitled to a fee if the company they proposed to Raytheon was one about "which either Raytheon or other brokers or finders have had acquisition

discussions or correspondence during the two years preceding [Lonsdale's] suggestion." The interpretation of this provision is not before us; it is at least arguable that "discussions or correspondence during the two years preceding" could be interpreted in a manner similar to Bushkin's "two years plus continuing interest."

with Henry Harnischfeger on Raytheon's behalf.

Raytheon did not respond to Bushkin's letter.

This correspondence presents the curious spectacle of Raytheon and Bushkin engaging in a disagreement in which each party takes a position opposite to the one it has taken during this litigation. It is not clear whether, as appellants contend, Bushkin's failure to do any further work on the two companies indicates that he accepted Raytheon's position, or whether, on the contrary, Raytheon's failure to respond indicates that Raytheon accepted Bushkin's position. Either, or neither, inference may be correct. It is undisputed, however, that Bushkin had the last word. In addition, Raytheon's internal memos on the two companies are far from conclusive as to whether it viewed its relations with the other brokers as a matter of obligation or of convenience. In any case, this correspondence cannot establish a three- or four-year obligation either as a general Raytheon policy or as part of a course of dealing with Bushkin. *Cf.* Mass.Gen.L.Ann. ch. 106, § 1–205(3) (1958) (definition of "course of dealing"). These letters certainly did not present an issue for the jury.

We conclude, therefore, that sufficient evidence was presented for a jury to have found an express contract for a term of at most two years plus "continuing interest."

## III. "CONTINUING INTEREST"

■ As we have noted, a "two years plus continuing interest" provision would mean that the issue on the express contract claim is whether Raytheon's interest in acquiring Beech was renewed before January 28, 1977. During argument, this issue was often referred to as that of "rekindling." The district judge held that the jury could have found that Bushkin's practice of asking for a time term of two years "plus continuing negotiations" could be interpreted in line with his explanation of the phrase as two years "plus continuing interest." He also held, however, that appellants had not presented sufficient evidence that the

rekindling had occurred during the required time.

The first dilemma facing us concerns the meaning of the term "continuing interest." "Continuing interest" is not a legal term, at least as it is used here. Defining the phrase requires a factual inquiry into a business practice. The contours of the practice were outlined in the course of Bushkin's testimony:

In other words, I submit a company as an acquisition candidate to a client, and the client can't decide whether or not he's interested, but he keeps asking for information; and he says—for example, as Bill Gottwald said for that whole period of a year, I'm interested in Beech aircraft, but nothing happens between the parties, there were no negotiations, but his interest was sustained.

When that happens, I consider that that obligation continues, and I believe the clients recognize that as well.

App. at 373. Bushkin further stated that such "continuing interest" did not require any communication between the potential acquirer and the prospective acquisition.

We think that the precise interpretation of "continuing interest," in the context of the evidence presented in this case concerning business practices, involves the application of common sense and experience, and the evaluation of the credibility of witnesses: *i.e.*, a typical inquiry for a jury. Once the jury had decided the meaning of "continuing interest" here, it could have proceeded to inquire whether such an interest existed in this case.

We review the chronology of events around the time that the two-year period was expiring. On November 29, 1976, Royal Little of Lonsdale sent Phillips a letter, suggesting Beech as a possible acquisition for Raytheon. On December 1, 1976, according to deposition testimony, Angus MacDonald spoke to Phillips about the advantages to Raytheon of such a transaction. Phillips responded that the idea was "very interesting" and that he would discuss it with his colleagues. On February 16, 1977, Phillips expressed his desire to meet Olive Beech and declared that he was

"very much interested in taking over Beech Aircraft." On February 28, 1977, Phillips denied a renewed interest in Beech in a conversation with Bushkin.

Appellants make a reasonable argument that these facts could have sustained a legitimate finding by the jury that a sufficient "interest" was rekindled before January 28, 1977. They stress that Phillips' positive response to MacDonald on December 1, 1976, was clearly different than his negative statements about Beech in July and November, 1975. This difference indicates, they argue, a substantial change of heart, a renewal of interest. In addition, they point to Phillips' denial of interest in Beech on February 28, 1977, twelve days after he had expressed a desire to acquire the company. To be sure, as appellee argues, Phillips was under no obligation to inform Bushkin of any of Raytheon's activities. The jury, however, could have considered whether Phillips' disingenuous denial signified that he wished to conceal the fact that he was proceeding with Lonsdale in violation of the contract with Bushkin.

Appellants also point to the failure of Phillips and Seaman to recall exactly when their interest in Beech was rekindled. We do not accept appellants' contention that this claimed lack of memory raises a negative inference as a matter of law or that the burden of proof on these matters lies with Raytheon. These were factors, however, that a jury might have considered as bearing on the credibility of these witnesses.

In light of the foregoing evidence, the jury might have thought that Phillips' expressed desire to acquire Beech on February 16, 1977, was sufficiently strong to indicate that it had been "rekindled" nineteen days earlier. If that were the case, the contract with Bushkin would still have been in effect. The jury could have based such a conclusion on its judgment that one does not decide to pursue a transaction of that magnitude without a significant period of reflection. Perhaps the February 16 statement could not alone give rise to an inference about the timing of the decision; in the context of all the other facts, however, we cannot say that it would have been unreasonable for a jury to have arrived at the conclusion that the interest shown on that date was a "continuation" of interest that existed at least nineteen days previously.

An evaluation of all these matters involves a consideration of the credibility and demeanor of witnesses, common sense and experience, and general knowledge of human action and motivation. These matters were within the province of the jury and well beyond the area of pure speculation or conjecture. We find that the evidence here warranted submitting to the jury the question of whether there was a sufficient renewal of "interest" in Beech Aircraft by January 28, 1977, to extend the contract with Bushkin.

### IV. QUANTUM MERUIT

█ Appellants also challenge the district court's rejection of their claim for the reasonable value of the information and services provided by Bushkin to Raytheon. Raytheon argues that appellants are barred as a matter of law from raising this claim. It contends that recovering on quasi-contractual grounds is not permitted where an enforceable express contract exists.

We reject appellee's contention. In the first place, the question of whether there was an express contract remains to be decided. For example, the district court held that the issue of whether Seaman had any authority, apparent or actual, to conclude the agreement with Bushkin presented a jury question. Such being the case, appellants were certainly entitled to plead in the alternative, arguing a quantum meruit theory as well as an express contract theory.

More importantly, restitution on quasi-contractual grounds often enters into the remedial calculus in a contractual context. *See generally* Perillo, *Restitution in a Contractual Context*, 73 Colum.L.Rev. 1208 (1973).[5] It is well established that a

---

**5.** *See also id.* at 1213–15:

While there is a great variety of quasi-contrac-

party to a contract may have the right to a quasi-contractual remedy when the other party has breached. *See, e.g., Salamon v. Terra,* 394 Mass. 857, 477 N.E.2d 1029, 1032 (1985); Restatement of Restitution, § 107(1) (1936). This is particularly the case where there has not been full performance because of the breaching party's violation of the terms of the agreement. *See Fay, Spofford and Thorndike, Inc. v. Massachussetts Port Authority,* 7 Mass. App.Ct. 336, 387 N.E.2d 206, 209 (1979). If it had resolved the "rekindling" issue in Bushkin's favor, the jury might have found that Raytheon's failure to work with Bushkin on the Beech transaction constituted a violation of the January 28, 1975, agreement. This failure would have prevented Bushkin from fully providing the services implied in that agreement.[6]

The district court ruled against appellants on the quantum meruit claim because it found that they had failed to prove that Raytheon had received any benefit from the information provided by Bushkin in 1975. The court's ruling was based on testimony by Phillips and Seaman that the information provided by Bushkin was placed in a closed file.

Appellants argue that Bushkin provided several important services to Raytheon. During the January 28, 1975, conversation, Bushkin informed Seaman that Beech could be acquired; Seaman had not been aware of that fact. Bushkin also gave Seaman various pieces of information about Beech. As a result of the conversation, Seaman ordered an internal Raytheon study of Beech. During the course of the year, Bushkin provided further information about Beech and continued to advocate the acquisition of Beech by Raytheon. To be sure, Raytheon's interest in Beech lay dormant between November, 1975, and No-

vember, 1976; it does not seem appropriate, however, to direct a verdict simply on the basis of the location of the file containing Bushkin's information. A jury might reasonably have found that the interest stimulated by Bushkin and the information provided by him in 1975 prepared the groundwork for the decision by Raytheon officials to pursue Beech approximately one year later. It might also have found that Bushkin's information was significant based on the fact that, as late as February, 1977, Royal Little of Lonsdale had not learned of Beech's requirements for a takeover. All these matters should have been evaluated by the jurors in the context of their common sense and experience.

Finally, the testimony of appellants' expert Stanley Foster Reed could have been considered by the jury on the quantum meruit claim. As we have noted, Reed's testimony was ambiguous in parts as to what legal claim it concerned. In the final redirect examination by appellants' counsel, however, Reed clearly focussed on the quantum meruit theory. He declared that the reasonable value of the information provided by Bushkin to Raytheon was one-half percent of the final transaction. We see no reason why the jury should not have been allowed to consider the testimony of Reed, along with all the other evidence, on the quantum meruit claim.

## V. CONTRACT IMPLIED IN FACT

The district judge construed Count II of the complaint as broad enough to include a claim for a contract implied in fact as well as a contract implied in law. We think that this is at least an arguable proposition.[7]

The judge analyzed this claim in accordance with the testimony of appellants' ex-

---

tual obligations and probably numerous sound ways to classify them, one great and fundamental dichotomy should be deemed essential: quasi-contract as a source of primary rights versus quasi-contract as a remedy.... The principal difference is that when the law of quasi-contract provides the sole basis of recovery ... its sole basis is very likely to be unjust enrichment. When, however, restitution is merely a secondary, remedial right in a

contractual context, unjust enrichment is merely one factor in the reallocation of gains and losses between the parties.

6. *See* our discussion of Bushkin's obligations under the agreement, *infra,* Part VI.

7. We note, however, that appellants' attorney argued, at least at one point at trial, that there was no implied in fact contract in this case.

pert Reed. We have already observed that Reed's testimony could be interpreted as relating primarily either to quantum meruit or to a contract implied in fact. Appellants' attorney stressed the quantum meruit interpretation. The district judge, however, focused on the support given by Reed's testimony for a contract implied in fact; a jury might also have interpreted it in this manner.

Reed testified that the conduct of the parties gave rise to an obligation to pay a reasonable fee for Bushkin's services. He stated that, to earn a fee, a finder need only inform a company of a potential acquisition, an activity he called "laying the name on them." He also stated that a "good finder" not only "lays the name" but also provides information about the advantages of the transaction. Reed discussed the information given by Bushkin to Seaman. He stressed that his finding of an implicit obligation to pay Bushkin was based on the presence of Bushkin's name in Raytheon's "Acquisition Log," and the reference to Bushkin as "our contact" in a Raytheon internal memo. He testified that an acquisition log such as Raytheon's is maintained in order for a company to know to which broker or finder it owes an obligation. Reed testified that such an obligation lasts for five years.

The district judge ruled that a claim of a contract implied in fact was barred by the proof presented by appellants on the express contract claim. Since appellants proved the existence of a "two years plus" express contract, the judge found that they were barred from claiming a five-year implied contract; two contradictory contracts could not have existed.

This appears to us to overstate the issue. Again, we note that the district court did not find that Bushkin had conclusively proven the existence of an express contract. Rather, it only decided that there was enough evidence for a jury to so find.

The jury, therefore, might have found against appellants on the express contract claim and yet have found for them on a contract implied in fact. Such an implied in fact contract would have been based on the conduct of the parties. The jury might have accepted that part of Reed's testimony establishing an implied obligation on the part of Raytheon on the basis of its conduct and its references to Bushkin in the log and the memo. It might also have accepted Reed's testimony on the duration of such an obligation; alternatively, it might have looked at the other evidence of trade practice and found a two-year or "two years plus" obligation.

In any case, a jury could have reasonably found an implied in fact contract and a verdict should not have been directed on this claim.

## VI. CAUSATION

Appellee argues that the directed verdict should be upheld due to the absence of a showing of efficient causation between Bushkin's efforts and the actual merger between Raytheon and Beech. We understand this contention as urging us to find an implied causation requirement in such agreements as a matter of law. This was not one of the grounds relied upon by the district court in granting the directed verdict.

We decline to impose such a rule of law. We note the wide variety of agreements of this sort, variously referred to as involving "brokers," "finders" and, even, "matchmakers." *See, e.g., Schaller v. Litton Industries, Inc.,* 307 F.Supp. 126, 127 (E.D. Wis.1969) (citing "Fiddler on the Roof").[8] The distinction between these various kinds of agreements concerns the degree of involvement in the ultimate transaction required of the broker. Agreements have been upheld which required only the most minimal connection. In *Davidson v. Robie,* 345 Mass. 333, 187 N.E.2d 371 (1963), the agreement provided

at most for preliminary investigation by Davidson of possible business ventures, and a disclosure of them to Robie which,

---

**8.** In his opening statement at trial, appellee's attorney referred to the period of negotiations leading to the merger as "a courtship ... an engagement period." The district judge referred to Lonsdale's activities as "romancing Mrs. Beech."

if profitable, would give rise to compensation in the nature of a commission, or, perhaps what is sometimes called a "finder's fee" to be paid to one who brings to [the promissor] a deal out of which he makes money.

*Id.* 187 N.E.2d at 374 (cites omitted).

Most of the Massachusetts case law in this field, particularly the older cases, involve "brokers," rather than "finders." The older cases often required the broker to be the efficient or predominating cause of the transaction. *See, e.g., Kacavas v. Diamond,* 303 Mass. 88, 20 N.E.2d 936 (1939). More recent cases, however, such as *Davidson,* recognize that while a requirement of efficient or predominant causation may be the customary arrangement, unusual agreements may provide otherwise. *See Sampson v. Eaton Corp.,* 809 F.2d 156, 159–60 (1st Cir.1987). In *Julius Tofias & Co. v. John B. Stetson Co.,* 19 Mass.App.Ct. 392, 474 N.E.2d 1162, 1165 (1985), the court summarized this trend by stating that "parties are free to make the broker's right to a commission depend upon" conditions other than efficient causation. The *Tofias* court evaluated the activities required of the broker on the basis of the language of the agreement and the nature of the employment. It found that the agreement at issue required only a "minimal causal connection" with the sale. *See Julius Tofias & Co.,* 474 N.E.2d at 1166. *See also* Restatement (Second) of Agency § 448, comment b (1958) (a "contract ... may provide that the agent's compensation is dependent upon the happening of an event whether or not the agent's efforts have produced it.").

The modern trend, in Massachusetts and in other jurisdictions, is for courts to treat as factual matters both the requirements of the specific agreement as well as the question of whether there was a showing of the requisite connection between the broker's efforts and the ultimate transaction. In *Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21, 24 (1971), the court found that the broker was not required to participate in negotiations between the two companies and that this did not bar recovery. The court further found that, despite a lapse of eighteen months between an initial set of negotiations and the "reactivation" of the deal, " '[t]racing a connection between the two is supported by the facts and the reasonable inferences to be drawn therefrom and is not to be rejected because of the intervening lapse of time.' " *Id.* (quoting lower court opinion, 299 N.Y.S.2d 712, 32 A.D.2d 62 (1969)).

We do not believe that Massachusetts would adopt appellee's proposed legal rule requiring efficient causation in all cases. Based on our reading of the Massachusetts cases, we find that the appropriate determination of the connection between the final transaction and the activities of a broker or finder is a factual, rather than a legal, matter. The jury should have been allowed to find the exact nature of Bushkin's obligations under the January 28, 1975, agreement. The basis for such a finding would have been, *inter alia,* the testimony of Bushkin and Seaman concerning that specific agreement, as well as the extensive testimony on general trade practices. After determining the exact nature of the agreement, the jury could have considered whether appellants had established the requisite connection between their efforts and the ultimate transaction.

Finally, we note that, regardless of what the jury might have found on the causation issue, appellants could still recover if Raytheon violated the contract by working with Lonsdale. As the court stated in *Simon v. Electrospace Corp.,* 269 N.E.2d at 29: "The rule is well established in brokerage cases, and is analogous here, that interference with the opportunity of a broker to complete his services does not bar his right to commissions [cites omitted]." If Raytheon prevented Bushkin from completing his obligations under the contract, such interference should not deprive Bushkin of a right to compensation.

*Reversed and remanded for a new trial.*